Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/18/2021 08:09 AM CDT

State of Nebraska, appellee, v.
Marcus R. Wheeler, appellant.
___ N.W.2d ___

Filed March 26, 2021.    No. S-19-781.

1. **Trial: Expert Witnesses: Appeal and Error.** An appellate court reviews for abuse of discretion a trial court's decision whether to admit or exclude an expert's testimony.

2. **Convictions: Evidence: Appeal and Error.** Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.

3. **Sentences: Appeal and Error.** Absent an abuse of discretion by the trial court, an appellate court will not disturb a sentence imposed within the statutory limits.

4. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

5. **Trial: Expert Witnesses.** Whether a witness is qualified as an expert is a preliminary question for the trial court.

6. **Expert Witnesses.** When faced with a proffer of expert scientific testimony, a trial judge must determine at the outset whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. The trial court should focus on the principles and methodology utilized by expert witnesses, and not on the conclusions that they generate.

7. **Trial: Expert Witnesses.** Before admitting expert opinion testimony, the trial court must determine, inter alia, whether the expert's knowledge, skill, experience, training, and education qualify the witness as an expert. A court must also determine whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology can be properly applied to the facts in issue.

8. ____: ____. There is no exact standard for fixing the qualifications of an expert witness, and a trial court is allowed discretion in determining whether a witness is qualified to testify as an expert.

9. ____: ____. Experts or skilled witnesses will be considered qualified if they possess special skill or knowledge respecting the subject matter involved superior to that of persons in general, so as to make the expert's formation of a judgment a fact of probative value.

10. ____: ____. A witness may qualify as an expert by virtue of either formal training or actual practical experience in the field.

11. **Criminal Law: Evidence: Appeal and Error.** When a criminal defendant challenges the sufficiency of the evidence upon which a conviction is based, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

12. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.

13. **Sentences.** In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.

14. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

15. ____. A sentence should fit the offender and not merely the crime.

Appeal from the District Court for Douglas County: Horacio J. Wheelock, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, Jessica C. West, and Douglas A. Johnson for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Miller-Lerman, J.

## NATURE OF CASE

Marcus R. Wheeler appeals his convictions and sentences in the district court for Douglas County for second degree murder and use of a firearm to commit a felony. Wheeler claims on appeal that the district court erred when it overruled his motion in limine to exclude the testimony of a firearm and toolmark examiner and when it later overruled his renewed objection at trial. He also claims that there was not sufficient evidence to support his convictions and that the court imposed excessive sentences. We affirm Wheeler's convictions and sentences.

## STATEMENT OF FACTS

On May 22, 2018, the State charged Wheeler with first degree murder and use of a firearm to commit a felony in connection with the shooting death of Kayviaun Nelson. The charges against Wheeler arose from an incident that occurred on April 18, when a group that included Wheeler was involved in a confrontation with a group that included Nelson.

Wheeler's trial began with opening statements and witnesses on April 17, 2019. On April 18, the second day of trial, Wheeler filed a motion in limine to exclude expert testimony by Angela Harder, a senior forensic technician with the Omaha Police Department and a witness the State expected to call in the second week of the trial. Wheeler alleged in the motion that Harder did not qualify as an expert in forensic toolmark analysis and that there was no support for her anticipated testimony that several shell casings found at the scene of the shooting were fired from the same gun. Wheeler asserted to the court that he had first been provided a copy of Harder's curriculum vitae on the evening of April 17 and that exchange was his

first notice the State intended to present Harder as an expert in forensic toolmark analysis.

Prior to Harder's testimony at trial, the court held a hearing outside the jury's presence to consider Wheeler's motion in limine and foundational issues with regard to Harder's testimony. Wheeler called Harder as a witness, and she testified regarding her position and experience with the Omaha Police Department, including having worked as a firearm and toolmark examiner since 2008.

As part of Harder's testimony, Wheeler offered into evidence a report prepared by the President's Council of Advisors on Science and Technology (the PCAST report). The PCAST report was dated September 2016 and was titled "Forensic Science in the Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods?" Without objection by the State, the court received the PCAST report into evidence solely for purposes of the hearing. Upon questioning by Wheeler, Harder testified that although she had not read the PCAST report in its entirety, because it dealt with multiple disciplines, she was familiar with the portions applicable to firearms and toolmarks. In response to questioning by Wheeler, Harder acknowledged that the PCAST report had criticized the methodology of toolmark identification that had been set forth by the Association of Firearm and Tool Mark Examiners (AFTE), a professional organization of which Harder was a member. Harder acknowledged the criticism contained in the PCAST report, but she testified that she adhered to the AFTE method and its position that all toolmarks are unique.

Wheeler also questioned Harder regarding her procedures for conducting toolmark comparisons of shell casings. She generally testified that she used a comparison microscope which allowed her to compare two items side by side. She first broadly examined general characteristics to determine that they were consistent, and if so, she then moved on to an examination of "individual characteristics that are caused by that cartridge case coming in contact with working parts of a firearm." In a circumstance such as the present case that involved

examination of several shell casings, Harder selected the shell casing that "marked the best," which she defined as that which "displayed the best markings that were the clearest," and compared the others to that shell casing. Harder conceded that there was "some subjectivity" involved in selecting the best shell case and in making comparisons.

Wheeler also questioned Harder regarding aspects of her education, training, and experience. Harder conceded that she had not completed coursework in firearm and toolmark analysis as part of either her undergraduate or her master's level college education. Harder further conceded that after she had completed training in toolmark analysis in 2008, she had not received further training until 2015. She testified that after she had "completed the academy" in 2008, there was "not a whole lot of further training available," and that the training she underwent in 2015 was "the next one that [she] had not already experienced." Harder also testified that while AFTE offered a certification in toolmark examination, she had not "gone through that process," and that instead, she and her laboratory took part in "the yearly proficiency test to demonstrate proficiency in the area." Harder further testified regarding peer review of her work. She testified that the examiner conducting a peer review received a copy of her report and therefore knew the results of her examination.

The State also questioned Harder at the hearing. During the State's questioning, Harder generally testified that AFTE had responded to the PCAST report and had taken issue with some of its conclusions and recommendations regarding toolmark analysis. Among AFTE's criticisms of the PCAST report was that it relied on a single laboratory study and had not considered other research conducted by multiple organizations. Harder agreed with this and AFTE's other criticisms of the PCAST report. During the State's questioning, Harder testified in more detail about training in toolmark analysis she had received from 2007 to 2008 in a program sponsored by the Bureau of Alcohol, Tobacco, Firearms and Explosives. She also testified regarding the ongoing proficiency testing and

peer reviews to which her skills and work were subjected, as well as the extent of her experience conducting toolmark analysis and presenting results in trials.

During questioning by both Wheeler and the State, Harder testified regarding the procedures she used in examining the shell casings in this case and the results of such examination. She generally testified that the results of her examination were that the seven shell casings that were found at the scene of the shooting were all fired from the same gun. As discussed below, Harder's testimony was used by the State in support of its one-gun theory of the case. Harder testified that she had completed two examinations of the shell casings; that each examination was peer reviewed, with the first being reviewed by one examiner and the second being reviewed by a different examiner; and that the peer reviewers agreed with her conclusions.

After the hearing, the district court filed an order in which it ruled on Wheeler's motion in limine and other issues involved in the hearing. The court began by finding that the State had complied with discovery requirements when it had disclosed to Wheeler the report by Harder of her firearms examination and when it had endorsed Harder as a witness prior to trial. The court noted that Wheeler had withdrawn part of his initial challenge to Harder's testimony. The court stated that based on the operative motion in limine, Wheeler was not challenging the scientific theory or methodology underlying Harder's testimony and instead was "challenging the foundation as to how . . . Harder arrived at her conclusions." The court therefore concluded that it was within its discretion to have an evidentiary hearing "to determine if proper foundation exists for . . . Harder's conclusion regarding [the shell casings found at the scene of the shooting] being fired from the same firearm."

Considering the testimony and evidence presented at the hearing, the court concluded that proper foundation was provided based on Harder's training and experience and the testimony she provided at the hearing. After reviewing relevant

statutes and case law, the court noted Harder's testimony regarding the procedures she followed to examine the shell casings in this case, the results of her examination, and the peer review of her results.

The court noted that Wheeler's challenge to Harder's testimony relied strongly on the PCAST report. The court acknowledged the criticisms set forth in the PCAST report, but the court also noted the conclusion in the PCAST report that whether firearm analysis should be deemed admissible based on current evidence was a decision that belonged to the courts. The court further noted the recommendation in the PCAST report that in order to allow firearms analysis in court, it should be shown that the expert has undergone rigorous proficiency training; that the expert should disclose the results of such proficiency testing; and that the expert should disclose whether, when performing the examination, he or she was aware of any other facts of the case that might have influenced the expert's conclusions.

Applying these and other considerations, the court stated that the type of ballistic and firearm testimony Harder presented in this case was not novel and was fairly routine in cases involving firearms and that such testimony was commonly admitted in courts in Nebraska. The court found that there was sufficient evidence to qualify Harder as an expert in the area of ballistics and toolmark analysis, including evidence that she had undergone yearly rigorous proficiency testing and that the results of such proficiency had been disclosed to her superiors in her laboratory. The court also noted Harder's testimony that she had very little knowledge regarding the history of the shell casings in this case. The court found that Harder's testimony would assist the trier of fact and that "her opinions are reliable and relevant based on her personal knowledge and experience in toolmark analysis." The court noted that the weight to be given to Harder's opinion was a matter for the trier of fact to determine and that the weight given to her testimony was a credibility determination that could be explored

on cross-examination. The court concluded that Harder was qualified to present her opinions and that her opinions would provide relevant and reliable information that would assist the trier of fact. The court therefore overruled Wheeler's motion in limine to exclude Harder's testimony.

Wheeler renewed his objections when Harder testified at trial. The court overruled Wheeler's objections based on its reasoning following the initial hearing. Harder thereafter testified regarding her examination of the shell casings and her opinion that the shell casings were all fired from the same gun.

Other evidence presented by the State at trial consisted in large part of testimony by witnesses to the events that resulted in the shooting death of Nelson. As noted earlier, the evidence was generally that the shooting occurred as part of an altercation between a group that included Wheeler and another group that included Nelson. Witnesses at trial included members of both groups, as well as bystanders. As Wheeler asserts in his brief on appeal, the testimony of individual witnesses varied and at points conflicted on issues such as the number of shots that were fired and whether Wheeler had a gun. Specific testimony and evidence will be discussed further in our analysis below, particularly, our analysis of sufficiency of the evidence. However, the testimony at trial set forth the following general narrative.

On April 18, 2018, a group that included Wheeler and a group that included Nelson found themselves in the parking lot of a Dollar General store at the same time. Wheeler and Nelson had dated in the past, but both were in new relationships. Nelson's group included her boyfriend, Andrell Goynes (Andrell), and his mother, Shawtina Wynn (Shawtina). Nelson had driven them to the Dollar General store so that Shawtina could make some purchases; Nelson's two young children were also in the vehicle that she was driving. Shawtina went into the store while Nelson, Andrell, and the children waited in the parking lot. While waiting there, Andrell noticed that a car occupied by Wheeler and his group was also in the parking lot.

Wheeler's group included his girlfriend, Tyanna Laushman; Tyanna's two sisters, Tashian Hickman and Yasmen Laushman; and Yasmen's boyfriend, Daion Williams. Wheeler's group was in a car driven by Hickman. Hickman parked the car in the parking lot of the Dollar General store and walked toward the store. Wheeler also got out of the car, but he started to walk toward Nelson's vehicle. One of the occupants of Hickman's car testified that Wheeler had indicated that he had seen someone he wanted to fight and that Wheeler was making gestures toward Andrell. Hickman told Wheeler to come into the store with her, and he did, as did Williams and Tyanna.

After seeing Wheeler, Nelson drove her vehicle to a different spot in the parking lot, and Andrell called Shawtina to see whether she was done with her shopping. Wheeler and his companions, and later Shawtina, eventually came out of the Dollar General store. Shawtina testified that when she came out of the store, she saw two men and two women arguing with Nelson and Andrell, who were seated in Nelson's vehicle. Shawtina got into Nelson's vehicle, and Nelson drove out of the parking lot.

The occupants of Nelson's vehicle noticed that Hickman's car was following them. Hickman testified that she followed Nelson's vehicle because Wheeler, Tyanna, and Yasmen asked her to. Shawtina contacted two of her other sons, Adren Goynes-Wynn and Andre Goynes-Wynn, to tell them that Nelson's vehicle was being followed. Adren and Andre instructed Shawtina to have Nelson pull her vehicle into the parking lot of a nearby Walmart store. Adren and Andre were at an apartment near the Walmart, and after speaking with Shawtina, they went to the store. They came out of the store when they saw Nelson's vehicle pull into the parking lot. Nelson parked her vehicle, and Andrell got out of the vehicle. Adren and Andre were walking toward Andrell when Hickman's car pulled into the Walmart parking lot.

Hickman parked her car a few stalls away from Nelson's vehicle. Williams testified that when Hickman pulled into the Walmart lot, he saw that Wheeler had a gun; Williams took

the gun from Wheeler and told him he did not need it. Wheeler got out of Hickman's car, followed by the other occupants of the car. Adren walked toward Hickman's car; Adren and Wheeler met up near Hickman's car, and an altercation ensued between Adren and Wheeler. During that altercation, Andrell approached Williams. Williams was holding the gun but did not point it at Andrell.

Williams testified that Wheeler came over to him and took the gun from him against his will. Adren testified that he saw Wheeler take the gun from Williams. Adren warned the others that Wheeler had a gun, and Adren then took off running. Andrell also testified that he saw Wheeler take the gun from Williams and that he then told Nelson to drive off. Andrell saw Wheeler pointing the gun at him, and he ran to the back of Nelson's vehicle. Andrell testified that at that point, Wheeler started shooting and Andrell ran around the vehicle and toward the Walmart store.

Williams testified that after Wheeler took the gun from him, he saw Wheeler fire shots toward Adren, Andrell, and Shawtina. Williams testified that Wheeler walked toward Adren, who was located near Nelson's vehicle. Williams observed that Nelson was attempting to drive her vehicle away; she bumped Wheeler with her vehicle, but he did not lose his balance. Williams heard more gun shots when Wheeler was located at the driver's side of Nelson's vehicle. Williams testified that Wheeler got back into Hickman's car, and Williams saw that Wheeler had the gun. Hickman then drove her car out of the parking lot.

Andrell testified that after having run from Wheeler and toward the Walmart store, he saw Nelson's vehicle moving within the parking lot. He ran toward her vehicle but lost track of it, and so he returned to the location where the altercation had occurred. When he reached that spot, he saw Shawtina and Andre there, but Wheeler and the car in which Wheeler's group were riding was no longer there. Andrell continued to look for Nelson's vehicle, and he saw a police vehicle moving through the parking lot. Andrell and Andre started jogging

in the direction of the police vehicle, and Andrell then saw Nelson's vehicle. Before Andrell could reach Nelson's vehicle, he was stopped by a police officer. Andrell saw another police officer pull Nelson out of the vehicle. More police vehicles and officers arrived, and the police put Andrell, Andre, and Shawtina into police vehicles for questioning.

Brent Kendall, an Omaha Police Department officer, arrived at the Walmart parking lot and saw Nelson's vehicle, which appeared to have struck another vehicle in the parking lot and was not moving. Kendall approached the vehicle and saw Nelson inside it. The window of the driver's side door was open, and Kendall saw that Nelson's head was back and her eyes were open, but she seemed to have no expression on her face. Kendall could not get Nelson to respond, but he felt a faint pulse in her neck, so he removed her from the vehicle. He and another officer observed what appeared to be a bullet wound in her chest.

Paramedics thereafter took over care of Nelson and transported her to a hospital, where she died. An autopsy revealed that Nelson had two gunshot wounds with entrance in her left chest and exit in her right upper back. The doctor who performed the autopsy opined that the gunshot wounds were the cause of Nelson's death.

After the shooting, but prior to the penultimate events in the parking lot described above, Wheeler and the rest of his group had left the Walmart parking lot in Hickman's car. Hickman dropped Wheeler, Williams, Tyanna, and Yasmen off at Tyanna's mother's house. The four later left that house and walked to another location, where they stayed after learning that Nelson had died. The next day, Tyanna and Yasmen went to police headquarters to speak with officers.

Warrants were issued for Williams and Wheeler. Williams was located and taken into custody on April 19, 2018. Wheeler was not located until April 24. When an officer first approached Wheeler and told him to get on the ground, Wheeler took off running. The officer pursued in his vehicle and caught up to Wheeler and took him into custody.

Physical evidence presented by the State included seven shell casings that were recovered from the Walmart parking lot. As noted above, Harder testified regarding her examination of the shell casings and her determination that all seven shell casings were fired from the same gun. Bullets were not recovered from either Nelson's body or her vehicle, and the gun that was used to fire the shots was not found or put into evidence.

The State presented testimony by Laura Casey, a senior forensic technician with the Omaha Police Department who processed Nelson's vehicle after the shooting in April 2018. Casey testified, inter alia, that the driver's side window was rolled almost all the way down and that the other windows were rolled up. She also testified that there was an apparent bullet hole in the extreme right edge of the front driver's seat and that there was a defect in the handle of the right rear passenger door. Casey testified that a probe was used to determine a possible bullet path between the driver's seat and the rear passenger door handle; she testified that the probing indicated that the "areas of defect did line up." Copper jacketing was found on the rear floorboard; Casey testified that copper jacketing that covers a bullet or projectile will separate from the rest of the projectile when it strikes or goes through an object. Casey testified that no projectiles or fragments were recovered from a search of the right rear passenger door.

In his defense, Wheeler presented testimony of two witnesses who were in the Walmart parking lot at the time of the shooting. One of the witnesses testified that she was in the parking lot and saw an altercation in which a vehicle was surrounded by a number of people. She saw the vehicle lurch forward and a man who had been standing in front of the vehicle jump out of the way. As he jumped, he raised his hands and she saw that he had nothing in his hands. She saw another man who had been on the driver's side of the vehicle, and she observed that he had what appeared to be a gun in his hands. The witness identified Wheeler as being the man in front of the vehicle who jumped and who had nothing in his hands.

Instructions given to the jury included a step instruction regarding the charge of first degree murder and the lesser-included offenses of second degree murder and manslaughter. The court also gave a self-defense instruction. The jury acquitted Wheeler of first degree murder, but it found him guilty of the lesser-included offense of second degree murder. The jury also found Wheeler guilty of use of a firearm to commit a felony.

The court thereafter held a sentencing hearing at which it considered the presentence investigation report, arguments by Wheeler and the State, and a live statement by Nelson's father. The court sentenced Wheeler to imprisonment for 70 to 100 years for second degree murder and for 7 to 15 years for use of a firearm. The court ordered the sentences to be served consecutive to one another.

Wheeler appeals his convictions and sentences.

## ASSIGNMENTS OF ERROR

Wheeler claims that the district court erred when it overruled his motion in limine and later overruled his objection to Harder's testimony regarding the results of her forensic toolmark examination. Wheeler also claims that there was not sufficient evidence to support his convictions and that the district court imposed excessive sentences.

## STANDARDS OF REVIEW

[1] An appellate court reviews for abuse of discretion a trial court's decision whether to admit or exclude an expert's testimony. *Reiber v. County of Gage*, 303 Neb. 325, 928 N.W.2d 916 (2019). See, also, *State v. Grant*, 293 Neb. 163, 876 N.W.2d 639 (2016).

[2] Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence,

pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Price*, 306 Neb. 38, 944 N.W.2d 279 (2020).

[3,4] Absent an abuse of discretion by the trial court, an appellate court will not disturb a sentence imposed within the statutory limits. See *State v. Senteney*, 307 Neb. 702, 950 N.W.2d 585 (2020). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

ANALYSIS

*District Court Did Not Abuse Its Discretion When It Overruled Wheeler's Motion in Limine and Admitted Harder's Testimony Regarding Ballistics and Toolmark Testing.*

Wheeler first claims that the district court erred when it overruled his motion in limine and when it later overruled his renewed objections to Harder's testimony regarding her ballistics and toolmark analysis. He argues that Harder's testimony should not have been admitted because (1) she did not qualify as an expert under Neb. Rev. Stat. § 27-702 (Reissue 2016) and (2) her testimony was unfairly prejudicial under Neb. Rev. Stat. § 27-403 (Reissue 2016). We conclude that the district court did not err when it overruled Wheeler's motion in limine and allowed Harder's testimony.

[5,6] Wheeler first contends that Harder was not qualified as an expert under § 27-702, which provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Whether a witness is qualified as an expert is a preliminary question for the trial court. *Reiber v. County of Gage*, 303 Neb. 325, 928 N.W.2d 916 (2019). When faced with a proffer of expert scientific testimony, a trial judge must determine at the outset whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Id*. The trial court should focus on the principles and methodology utilized by expert witnesses, and not on the conclusions that they generate. *Id*.

[7] Under § 27-702 and our case law, before admitting expert opinion testimony, the trial court must determine, inter alia, whether the expert's knowledge, skill, experience, training, and education qualify the witness as an expert. See *State v. Braesch*, 292 Neb. 930, 874 N.W.2d 874 (2016). A court must also determine whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology can be properly applied to the facts in issue. See *id*. In connection with the just recited proposition, we note, as did the district court, that in this case, Wheeler dropped his challenge to the methodology Harder used to perform her toolmark analysis. Instead, Wheeler's argument at trial and on appeal focuses on what he alleges to be gaps or deficiencies in Harder's training and qualifications, and we therefore focus on the district court's analysis regarding Harder's qualification as an expert in toolmark analysis.

[8-10] There is no exact standard for fixing the qualifications of an expert witness, and a trial court is allowed discretion in determining whether a witness is qualified to testify as an expert. *State v. Daly*, 278 Neb. 903, 775 N.W.2d 47 (2009). Experts or skilled witnesses will be considered qualified if they possess special skill or knowledge respecting the subject matter involved superior to that of persons in general, so as to make the expert's formation of a judgment a fact of probative value. *Id*. A witness may qualify as an expert by virtue of either formal training or actual practical experience in the field. *Id*.

In this case, the district court found that there was sufficient evidence to qualify Harder as an expert in the area of ballistics and toolmark analysis. And it did so even in the face of the competing PCAST hypothesis. The court relied on evidence of Harder's training and her personal knowledge and experience, as well as the fact that she had been subjected to ongoing proficiency testing. Wheeler cross-examined Harder with what he asserted were shortcomings in her education and training. Harder conceded that she had not completed coursework in firearm and toolmark analysis as part of her undergraduate or master's level college education and that she had not gone through the AFTE certification. However, Harder testified regarding training specific to toolmark analysis that she had undergone subsequent to her formal college education, and she testified that while she had not gone through the certification process, the laboratory with which she was associated chose instead to go through yearly proficiency testing in order to ensure continued competence.

Given the evidence of Harder's training and proficiency testing, as well as evidence of her experience in the field of ballistics and toolmark analysis, we determine that the district court did not abuse its discretion when it concluded that Harder was qualified as an expert in the area of ballistic and toolmark analysis.

Wheeler also argues that Harder's testimony should have been excluded under § 27-403, which provides that relevant evidence may be excluded if, inter alia, its probative value is substantially outweighed by the danger of unfair prejudice. Wheeler argues that Harder's testimony was unfairly prejudicial for two reasons: first, because the State presented her as an expert when she was not qualified, and second, because the State used her expert opinion as the basis for its theory that only one gun was fired at the scene of the shooting.

With respect to the first argument, Wheeler was not prejudiced by the presentation of a nonexpert, because Harder was in fact an expert. With respect to the second argument,

Harder's testimony in support of the State's one-gun theory was unfavorable, but not unfairly prejudicial.

Regarding the one-gun theory, Wheeler claims unfair prejudice because the State's one-gun theory foreclosed his defense theory that the shots that struck Nelson were not fired by him but by some other person at the scene who also had a gun. As he asserts with regard to his claim of insufficient evidence, which we consider below, Wheeler contends that other than Harder's testimony, there was no credible evidence to support the State's one-gun theory, and that he presented evidence which showed that there was at least one other gun and that another person fired the shots that struck Nelson.

Harder's testimony was probative of an issue in this case. The State and Wheeler presented differing theories as to whether more than one gun was fired during the altercation. Seven shell casings were found at the scene, and Harder's opinion was that all seven were fired from the same gun. Therefore, Harder's testimony provided some evidence to support the State's theory of one gun and to refute Wheeler's theory of multiple guns being fired. Harder's testimony was not unfairly prejudicial because her opinion was limited to the specific shell casings that were tested, and she did not opine on whether other guns may have been present or fired at the scene. Her testimony was limited to the specific shell casings that she tested.

Wheeler's argument of unfair prejudice therefore is not aimed so much at Harder's testimony per se but at the State's use of her testimony to argue that it had proved the State's one-gun theory. To the extent Wheeler had evidence to refute the State's theory, Wheeler was able to present that evidence and argue his competing theory to the jury. To the extent Wheeler's complaint was that the State overstated or misstated Harder's testimony and claimed that such testimony alone conclusively proved that there was only one gun at the scene, the proper response would have been for Wheeler to object to any closing arguments that he believed misstated the evidence. We note in this respect that Harder's testimony was not the only

evidence the State relied on to present its theory; the State also relied on witnesses who testified that they saw Wheeler in possession of a gun but did not see any other guns. In any event, Wheeler's argument does not establish that Harder's testimony was in itself unfairly prejudicial or that it should have been excluded pursuant to § 27-403.

We conclude that the district court did not abuse its discretion when it determined that Harder qualified as an expert and that the probative value of her testimony was not outweighed by unfair prejudice. The district court therefore did not err when it overruled Wheeler's motion in limine and allowed Harder to testify. We reject this assignment of error.

*There Was Sufficient Evidence to*
*Support Wheeler's Convictions.*

Wheeler next claims that there was not sufficient evidence to support his convictions. He argues that the evidence was not sufficient in two general respects: (1) There was no evidence that showed that shots fired by Wheeler were the shots that killed Nelson, and (2) there was insufficient evidence to rebut his claim of self-defense. We conclude that there was sufficient evidence to support the jury's verdicts.

[11] In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Price*, 306 Neb. 38, 944 N.W.2d 279 (2020). When a criminal defendant challenges the sufficiency of the evidence upon which a conviction is based, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

Wheeler first contends that there was not sufficient evidence to show that he fired the shots that struck Nelson. He

acknowledges that there was testimony that he was in possession of a gun at the time witnesses heard shots, but he notes a conflict in the testimony because his defense witness testified that she saw Wheeler in front of the vehicle without a gun in his hands and that she saw a different man with a gun on the driver's side of the vehicle.

Wheeler emphasizes that his argument is not merely there was a conflict in the evidence and that his argument cannot be dismissed as a credibility determination or weighing of evidence to be resolved by the jury. Instead, Wheeler argues that there was no evidence from which a rational trier of fact could find that any shots he might have fired while in front of Nelson's vehicle could have been the shots that struck and killed Nelson. He asserts there was no specific evidence indicating that he fired shots through the driver's side window of Nelson's vehicle and that instead, the only evidence was that he fired shots when he was in front of the vehicle. He argues that this is significant, because the testimony of Casey, the forensic technician who processed Nelson's vehicle, indicated that the bullets that struck Nelson were fired through the open driver's side window. He argues that shots fired from in front of the vehicle could not have entered through the driver's side window; instead, such shots could only enter through the front windshield and there was no evidence of bullets' entering through that trajectory.

The State notes, however, that there was testimony from which the jury could find that Wheeler fired shots when he was located on the driver's side of Nelson's vehicle. Edie Derry, a bystander who was not part of either Wheeler's group or Nelson's group, testified that she saw a man who pulled a gun and aimed it "towards the two boys first and then spun around towards the woman," that the woman "had gotten into her vehicle and was starting to pull away," and that the man "fired two shots into the driver's side open window of the vehicle." Derry also testified that "[t]he shooter had curly hair or dreadlocks"; other evidence indicated that Wheeler had dreadlocks on the day of the shooting.

Hickman testified that she saw Wheeler aiming a gun at Andrell and that she put her head down and heard shots. Hickman testified that she saw Wheeler in front of Nelson's vehicle and that then she saw Nelson's vehicle "hitting" Wheeler. Hickman testified that she heard more shots after Nelson's vehicle hit Wheeler. Yasmen also testified that she saw Nelson's vehicle moving forward and that the vehicle "bumped" Wheeler. Yasmen testified that after Wheeler was bumped, he "stumbles off and catches his balance and then goes to the side and starts shooting towards the car." Yasmen clarified that although she could not see Wheeler firing the gun, she saw that he was on the driver's side of the vehicle after being bumped and at that time she heard shots. Williams similarly testified that he saw Nelson bump Wheeler with her vehicle and that Wheeler ended up on the driver's side of the vehicle after he was bumped; Williams testified that he heard additional shots when Wheeler was on the driver's side of the vehicle.

Therefore, there was evidence from which the jury could find that shots were fired at a time when Wheeler was on the driver's side of the vehicle. The jury could infer that the shots were fired by Wheeler and that the shots went through the open driver's side window and struck Nelson.

Because it was the jury's province to determine credibility, resolve conflicts, and weigh the evidence, we as an appellate court consider only whether there was sufficient evidence to support the finding of the jury as fact finder. There was evidence from which the jury could have found that Wheeler fired shots while he was on the driver's side of Nelson's vehicle. To the extent that such evidence was not stronger or that there was conflicting testimony, it was the jury's duty to resolve inconsistencies, to weigh the evidence, and to determine which witnesses they found to be credible. We do not pass on the credibility of witnesses on appeal, *State v. Price*, 306 Neb. 38, 944 N.W.2d 279 (2020), and because there was evidence from which the jury could rationally find that Wheeler

fired the shots that struck and killed Nelson, the evidence was sufficient.

Wheeler also argues that the State did not present sufficient evidence to rebut his claim of self-defense. In particular, Wheeler notes there were some conflicts in the evidence on the issue of self-defense. As urged by Wheeler, the district court found evidence from which a jury could find that Wheeler was defending himself against a threat imposed by Andrell, Adren, and Andre and therefore instructed on self-defense. There was testimony, however, particularly that of Andrell and Adren, that they were running away from Wheeler when he fired shots. Furthermore, there was evidence indicating that the shots that hit Nelson were fired after the shots that were aimed at Andrell and others. As such, the jury could have found that Wheeler was not acting in self-defense when he fired the shots that killed Nelson.

Again, the credibility and weight of witness testimony are for the jury to determine, and witness credibility is not to be reassessed on appellate review. See *State v. Price, supra*. Any conflicts in the evidence or questions concerning the credibility of witnesses are for the finder of fact to resolve. *Id*. Because the jury found Wheeler guilty of second degree murder and use of a deadly weapon to commit a felony, it apparently disbelieved the evidence presented by Wheeler asserting that he acted in self-defense. To the contrary, there was sufficient evidence presented to support a finding that Wheeler did not act in self-defense, and we will not reassess the jury's finding on appeal.

Wheeler also argues that at best, the evidence supported a conviction for sudden quarrel manslaughter. However, there was evidence that the altercation continued from one parking lot to another, that Wheeler directed Hickman to follow Nelson's vehicle, and that Wheeler approached Nelson's vehicle and wanted to fight Andrell. Although there was evidence in support of the version of events as urged by Wheeler, the State presented evidence which contradicted his version of events and from which the jury could have found that Wheeler

fired the shots with the required intent for second degree murder and that the shooting of Nelson did not result from a sudden quarrel and, as previously noted, was not justified as self-defense.

Viewing the evidence in the light most favorable to the State, we conclude that the evidence was sufficient to support Wheeler's convictions for second degree murder and use of a firearm to commit a felony. We therefore reject this assignment of error.

*District Court Did Not Abuse Its Discretion*
*When Imposing Sentences.*

Wheeler finally claims that the district court imposed excessive sentences. He contends that the court did not adequately consider relevant mitigating factors, including his age. We find no abuse of discretion in the sentencing.

Wheeler was convicted of second degree murder, a Class IB felony under Neb. Rev. Stat. § 28-304(2) (Reissue 2016), and use of a firearm to commit a felony, a Class IC felony under Neb. Rev. Stat. § 28-1205(1)(c) (Reissue 2016). The sentencing range for a Class IB felony is imprisonment for a minimum of 20 years and a maximum of life, and the sentencing range for a Class IC felony is imprisonment for a mandatory minimum of 5 years and a maximum of 50 years. Neb. Rev. Stat. § 28-105 (Reissue 2016). The district court sentenced Wheeler to imprisonment for 70 to 100 years for the second degree murder conviction and for 7 to 15 years for the weapon conviction, and the court ordered the sentence for the weapon conviction to be served consecutive to the sentence for the murder conviction, as required by § 28-1205(3). The sentences imposed by the court were therefore within statutory limits.

[12] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Price*, 306 Neb. 38, 944 N.W.2d 279

(2020). We therefore consider whether the court abused its discretion when it imposed those sentences.

[13,14] Wheeler argues that the district court abused its discretion when it sentenced him because it did not adequately consider relevant mitigating factors. In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

[15] Wheeler argues that the court failed to give adequate weight to mitigating factors, most notably his age but also his mentality, social and cultural background, lack of criminal record, and motivation. He argues that instead of giving due consideration to these mitigating factors, the court placed too much weight on the circumstances of the offense, particularly the location of the shooting. Wheeler notes that we have said that a sentence should fit the offender and not merely the crime. See *State v. Gray*, 307 Neb. 418, 949 N.W.2d 320 (2020). He argues that by emphasizing the circumstances of the offense over the mitigating factors, the court abused its discretion by tailoring the sentences to the crime rather than to him.

In arguing that the court did not adequately consider his age, Wheeler cites *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), in which the U.S. Supreme Court held that a sentence of mandatory life imprisonment without parole for a juvenile violated the Eighth Amendment's prohibition on cruel and unusual punishment. Wheeler cites *Miller v. Alabama* for its reasoning regarding the culpability of adolescents. However, Wheeler was not sentenced to life

imprisonment without parole, and the presentence investigation report indicates that Wheeler was born in June 1998. He was 19 years old at the time of the offense and therefore was neither a juvenile nor an adolescent.

Nevertheless, Wheeler's relatively young age is a relevant factor to be considered in sentencing. In this regard, we note that the presentence investigation report and the argument of Wheeler's counsel at sentencing provided the court with information regarding Wheeler's age and the other relevant factors urged by Wheeler as mitigating in favor of a lesser sentence. At the sentencing hearing, the court stated that it had considered all the relevant factors urged by Wheeler, including "Wheeler's age, mentality, education, experience, social and cultural background, past criminal record, [and] motivation for the offense." The court gave particular consideration to Wheeler's age, stating that it had given Wheeler "all of the benefit of the doubt that [it] possibly [could] regarding his youthful age," that it had considered Wheeler's age "an extreme mitigating factor in his case," and that it had given the age factor "the utmost consideration."

But the court also considered relevant factors such as the "nature of the offense and the violence involved in the commission of the offense." The court characterized the offense as "a senseless killing that should have never happened" and noted evidence that "[a]t least seven shots were fired . . . ." Wheeler characterizes the court as placing too much emphasis on the location of the shooting. In this regard, the court noted at the sentencing that the shooting "happened at a crowded Walmart parking lot where many innocent bystanders were just parking their cars and walking in and out of the parking lot trying to go into Walmart like we all do." The court further "underscore[d] that this happened at a crowded Walmart where people were coming and going," and the court noted that "Nelson was not the intended victim in this case, she was completely innocent and she suffered the consequences of a bullet that was meant for somebody else."

Wheeler characterizes the court's statements as being an indication that the court was emphasizing "protection of the public" as a justification to impose a long term of imprisonment, and he argues that consideration for protection of the public should focus on future protection and should consider prospects for rehabilitation. Brief for appellant at 43. We read the comment of the court regarding the public safety as a relevant fact in connection with "the nature of the offense" and "the amount of violence involved in the commission of the crime." See *State v. Price*, 306 Neb. 38, 61, 944 N.W.2d 279, 296 (2020). The court properly considered that by shooting at persons involved in the altercation while in a busy parking lot, Wheeler endangered not only his intended targets but also Nelson and other unintended targets, as well as innocent bystanders.

The court appropriately weighed these considerations regarding the nature of the offense and the amount of violence involved against Wheeler's age and the other mitigating factors he advanced. We do not think the court ignored relevant mitigating factors, considered inappropriate factors, or placed undue emphasis on irrelevant circumstances. We find no abuse of discretion.

We conclude that the sentences imposed by the court were not an abuse of discretion, and we therefore reject Wheeler's claim that the district court imposed excessive sentences.

## CONCLUSION

We conclude that the district court did not err when it overruled Wheeler's motion in limine and later overruled his objection to Harder's testimony regarding ballistics testing and toolmark analysis. We further conclude that there was sufficient evidence to support Wheeler's convictions and that the court did not abuse its discretion in sentencing Wheeler. We therefore affirm Wheeler's convictions and sentences.

Affirmed.