IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. BROWN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

BILLY J. BROWN, APPELLANT.

Filed May 16, 2023.    No. A-22-658.

Appeal from the District Court for Lancaster County: LORI A. MARET, Judge. Affirmed.

Joe Nigro, Lancaster County Public Defender, and Sarah J. Safarik for appellant.

Michael T. Hilgers, Attorney General, and George C. Welch for appellee.

RIEDMANN, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## INTRODUCTION

Following a jury trial in the Lancaster County District Court, Billy J. Brown was convicted of third degree domestic assault and sentenced to serve 365 days' imprisonment in the Lancaster County Department of Corrections. Brown appeals his conviction and sentence, claiming there was insufficient evidence to support his conviction and that his sentence was excessive. We affirm.

## BACKGROUND

Shortly after Brown's wife, Jennifer Brown (Jennifer), filed for divorce, an incident occurred in the family home on November 16, 2020, which resulted in criminal charges being filed against Brown. An information, as amended, charged Brown with second degree domestic assault, a Class IIIA felony; terroristic threats, a Class IIIA felony; first degree false imprisonment, a Class IIIA felony; and child abuse, a Class I misdemeanor.

- 1 -

A jury trial was held over the course of four days in July 2022. Evidence was presented through witness testimony, photographs, text messages, and voice recordings. A summary of the evidence follows.

JENNIFER'S TESTIMONY

Jennifer testified that she and Brown were married in September 2007; they had two children: a son, T.B., age 14, and a daughter, R.B., age 9. In July 2019, Jennifer and Brown physically separated and Jennifer moved out of the family home; the children remained living with Brown. On October 20, 2020, Jennifer filed for divorce.

At the time of the November 16, 2020, incident, Jennifer was staying with a friend and the children were living with Brown. At 8 p.m. that day, Jennifer went to Brown's house to spend time with the children. Jennifer spent an hour with the children and then went to Brown's bedroom to speak with him. Jennifer was "trying to keep it brief" and at "a quarter" after 9 p.m., she informed Brown that she intended to leave. He told her that he did not want her to leave. When Jennifer attempted to leave, Brown "tackled [her] onto the bed," "twisted [her] up," and "put[] his body weight on [her]." As Brown held Jennifer in this position, he told her again that he "didn't want [her] to go."

After a few minutes, Brown let Jennifer go and brought up the topic of sex. When Jennifer told Brown that she was not going to have sex with him, he "grabbed [her] and pulled [her] pants down and pushed [her] down on the bed. And had his way." When asked whether she "fe[lt] like [she] consented to that," Jennifer responded, "No." Afterwards, Jennifer went to the bathroom. When she returned, she asked Brown where her pants were. After initially refusing to tell her, he informed her that they were between the box spring and the mattress. Jennifer retrieved her pants and again informed Brown that she intended to leave. As Jennifer was putting her pants back on, Brown took her phone and keys and put them in his bedside drawer.

When Jennifer attempted to retrieve her items, Brown "block[ed] [her]" and began "screaming at [her]" and "[t]elling her [she] wasn't going to leave." Brown then hit her "in the chest and the back." Jennifer stated that it was "very painful" and "made it hard to breathe." In an attempt to protect herself, she "slid[] down to the floor" and "cower[ed] away from [Brown]." Brown then repeatedly hit her with a belt on her "hip and thigh area," called her names, spat on her, and told her that "he wanted [her] to hurt the way [she] had hurt him when [she] left." According to Jennifer, Brown was mostly hitting her with "the actual belt end" but at "one point [she] put her arm down to block the blows" and the buckle hit her wrist. Brown struck her with the belt "probably 15 to 20" times for "a good minute or so."

Jennifer "tried to scoot away," but while she was "still on the ground and [Brown was] over [her] . . . he produce[d] duct tape from somewhere and start[ed] to tape up [her] legs together." She was "begging and pleading . . . asking him to stop." Jennifer described Brown as "enraged" during this incident and he told her that "he was going to take [her] downstairs and tie [her] up and possibly kill [her] and himself before morning." Jennifer felt terrified because she knew he had firearms in the house.

Jennifer apologized to Brown and said "whatever [she] could to . . . get him to stop." Once she did this, "his whole demeanor changed." Brown then removed the duct tape from her legs but kept her phone and keys in his bedside table. Jennifer felt she could not leave, so she turned on the

- 2 -

television and sat on the opposite side of the bed. While Jennifer and Brown watched television, Brown flicked Jennifer's face, "and ended up catching his nail on the edge of [her] nose[,] taking a chunk out" and causing her nostril to bleed. Jennifer wiped the blood from her nose on the bed sheet. Brown also "stuck his hand on [her] head and . . . scratched at [her] scalp." Jennifer said that "he seemed like he was trying to be playful" but "it wasn't funny." Jennifer "focused on the tv [sic] just to try to ignore him." Brown fell asleep at 11 p.m., at which point Jennifer retrieved her phone and keys from the bedside table, checked on the children, and left Brown's house.

The following morning, Jennifer attended an appointment with her divorce attorney, where she informed her attorney about the events of the prior evening. Jennifer's attorney urged her to speak with law enforcement. When asked why she did not speak with law enforcement before her attorney suggested it, Jennifer responded, "Because I was terrified. I didn't know if . . . he would find out[,] if he would come after me." She further stated that she "had never . . . reported anything like that before" and she "was just scared."

Jennifer's attorney contacted law enforcement and Jennifer went to the police station where she spoke with law enforcement for 6 hours about the events that took place on the night of November 16, 2020. Well into the interview, she mentioned the sexual encounter. When asked why she did not inform law enforcement about it earlier in the interview, she stated that she "was so used to [Brown] taking what he wanted, taking sex . . . it was just easier for [her] to just lay there and not move and let him . . . get it done with." She also stated that she was "more worried about the . . . beating and the . . . threats" at that time. On cross-examination, Jennifer acknowledged that she told law enforcement that she did not believe the sexual encounter was "a sexual assault, or rape, or anything."

TEXT AND VOICE MESSAGES

Jennifer testified that on November 17, 2020, Brown sent her numerous text messages and that she was with law enforcement when some of the text messages between her and Brown were exchanged. Law enforcement assisted Jennifer in drafting some of the messages she sent to Brown. In one message, Brown stated, "Please excuse my horrible conduct last night. I will continue to get better with practice." He then asked Jennifer to call him. Jennifer responded that she could not speak on the phone. She also wrote, "I have a huge bruise on my hip from where you hit me with your belt last night and my chest is still in a lot of pain. It is not ok for you to ever treat me like that." Brown responded, "You are right. I am an idiot. I do not deserve you . . . . I'm sorry."

In another message, Jennifer asked Brown, "Why did you hit me with your belt? Did you not think it would bruise that bad or what?" Brown responded:

I didn't even think about what the belt would do. All I thought was my dad used it on me so it must not be terrible . . . . I did not intend any bodily harm[,] my [i]ntention was to scare you a bit so you could understand how afraid the kids are to confront you and also to make you feel helpless as I do every moment I am awake.

In another message, Brown wrote, "The belt was to scare. It was not supposed to cause pain. It is still my fault and I cannot expect you to forgive me."

Brown left Jennifer a voice message the day after the incident, in which Brown stated:

[L]ast night's little ordeal was between you and I. I don't regret one bit of a damn thing. You deserve everything you got out of it the way you've been treating us. I bet you don't even . . . learn a damn thing about it. I bet everything went through one ear and right out the other. Everything I talked to you about, you didn't soak in one bit of it. That's what pisses me off in the world.

### PHOTOGRAPHS

Numerous photographs of Jennifer's injuries were taken by law enforcement at the police station the day after the incident and two days after that.

Jennifer testified about the photographs, several of which depicted a large, dark bruise on her left hip. She stated that the location of the bruise was where Brown repeatedly hit her with the belt. Multiple photographs depicted redness and swelling on Jennifer's left wrist, where she stated Brown hit her with the belt buckle. There were also photographs depicting very light bruising on Jennifer's chest and back. The law enforcement officer who took the photographs the day after the incident testified that she did not see visible injuries on Jennifer's chest and back. However, the officer who photographed Jennifer's injuries a couple days afterwards testified that she observed faint, "[s]mall dots of bruising" on Jennifer's chest and back. There were also photographs depicting a scratch on Jennifer's nose, where Jennifer stated "a chunk of skin came out" when Brown was flicking her face. Jennifer testified that she sustained the injuries depicted in the photographs on the night of November 16, 2020.

On cross-examination, Jennifer said that an hour before going to Brown's house, she was at the grocery store and "went to bend over and grab something and went down on [her] knees, and . . . couldn't get back up." However, she stated that she "didn't fall, get stuck, or sustain any injuries" as a result.

Law enforcement testified that on November 17, 2020, officers arrested Brown and conducted a search of his house. During the search, officers photographed and seized numerous items in Brown's house. Among the items seized were multiple leather belts located in Brown's bedroom, as well as a piece of used duct tape found on the dresser and a roll of duct tape found in the dresser. The used duct tape was not tested for the presence of DNA. There were also photographs of a red substance on the bed sheet, which a law enforcement officer testified was presumed to be blood, but no forensic testing was conducted to confirm that.

### PHONE CONVERSATIONS

Numerous recordings of jail phone calls were received into evidence, including calls between Brown and his mother and a call between Brown and his friend.

During the phone conversations between Brown and his mother, Brown generally denied Jennifer's characterization of the assault but admitted multiple times that he and Jennifer argued and that he "spanked" her. During one phone call, he told his mother that he "chewed [Jennifer's] butt about not talking to the kids and [he] spanked her butt." He also said that he took Jennifer's "keys, thr[ew] them in the drawer," and told Jennifer that she was "gonna listen to [him] for a minute." In one call he said, "Yes, I did wrong. But not to the extent and way it sounds."

In a phone call between Brown and his friend, Brown said "I spanked [Jennifer's] ass for fucking not listening to the kids." He also told his friend,

> I didn't hold her against her goddamn will. I grabbed her keys and said "you're gonna listen to me while I tell you . . . your kids are scared to death." They won't talk to her because they're afraid they're going to chase her further away . . . . So I fricken talked to her and she didn't want to listen to what I had to say. And I said, "Listen Jen. Your keys are staying in the drawer," and I said . . . "you gotta listen and sit down." I said, "These kids need a mother." . . . And I picked up my belt and I whooped her a couple times . . . I come from old school, you know? My grandpa whooped my grandma when she was being a little brat. . . . But I didn't take my hand and open it and fucking hit her, you know?

Brown also stated that "there's no law saying you can't spank a kid for being a brat. And that's what she was doing."

CHILDREN'S TESTIMONY

T.B. testified that he recalled Jennifer coming to Brown's house after school the day before Brown was arrested. As he was getting ready for bed, T.B. heard Jennifer and Brown "arguing" and "yelling" in Brown's bedroom. T.B. stated that the arguing started shortly after Jennifer and Brown went into Brown's room, but he did not know how long it lasted because he "went to bed before it stopped."

R.B. testified that she recalled the day that law enforcement arrested Brown and the night before when Jennifer came over and spoke with T.B. and her. She testified that when Jennifer and Brown went into Brown's bedroom, T.B. and R.B. were getting ready for bed. R.B. "heard [Jennifer] screaming" and she could hear Brown's voice, which "sounded kind of mean." She said that Jennifer sounded "[s]cared" and "hurt." When asked whether this went on for more than 5 minutes, R.B. responded, "Probably." R.B. said that while this was happening, she felt scared and she got out of bed and went to the hallway upstairs, where she could hear better. She was there for "[a]t least up to 10 minutes." She then went back to bed in her room and struggled to fall asleep because there were "lots of noises" coming from Brown's bedroom. The following morning, Jennifer was gone but Brown was still at the house.

JURY VERDICT

After deliberation, the jury found Brown guilty of the lesser-included offense of third degree domestic assault and not guilty of the remaining charges. The district court accepted the jury's verdict. On August 24, 2022, the court sentenced Brown to a year of imprisonment with 35 days' credit for time served.

ASSIGNMENTS OF ERROR

Brown assigns that (1) the evidence adduced at trial was insufficient to convict him of third degree domestic assault and (2) the sentence imposed by the district court was excessive and constituted an abuse of discretion.

## STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finder of fact. *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020).

## ANALYSIS

### SUFFICIENCY OF EVIDENCE

Brown claims that the evidence adduced at trial was insufficient to sustain his conviction of third degree domestic assault. Neb. Rev. Stat. § 28-323 (Reissue 2016) provides in relevant part:

> (1) A person commits the offense of domestic assault in the third degree if he or she:
>
> (a) Intentionally and knowingly causes bodily injury to his or her intimate partner;
> (b) Threatens an intimate partner with imminent bodily injury; or
> (c) Threatens an intimate partner in a menacing manner.

Brown does not dispute that Jennifer was his intimate partner. Brown claims the evidence was insufficient to prove that he intentionally and knowingly caused Jennifer bodily injury, threatened her with bodily injury, or threatened her in a menacing manner.

The evidence at trial included Jennifer's testimony that Brown repeatedly hit her with a belt, hit her with his hand on her back and chest, and forcibly had sex with her. She also testified that Brown duct taped her legs together and told her that "he was going to take [her] downstairs and tie [her] up and possibly kill [her] and himself before morning." She further testified that Brown flicked her in the nose and scratched her nostril. There was also photographic evidence of a large, dark bruise on Jennifer's hip, light bruising on her chest and back, redness and swelling on her wrist, and a scab on her nose. The law enforcement officer who took the second set of photographs on November 19, 2020, testified that there was very light bruising on Jennifer's chest and back which looked like faint, "[s]mall dots of bruising."

Brown asks us to reassess the credibility of Jennifer's testimony, arguing that "the injuries law enforcement observed on [Jennifer's] body were not consistent with the way [Jennifer] described the abuse occurred." Brief for appellant at 15. However, the credibility and weight of witness testimony are for the jury to determine, and witness credibility is not to be reassessed on appellate review. See *State v. Wheeler*, 308 Neb. 708, 956 N.W.2d 708 (2021).

The evidence also included numerous admissions made by Brown through text messages, voicemail, and during jail phone calls. In a text message exchange between Jennifer and Brown which took place the day after the incident, Jennifer confronted Brown for hitting her with his belt on her hip. Brown did not deny that he hit her with his belt. He stated that he "didn't even think

about what the belt would do" and that he "did not intend any bodily harm" but intended "to scare [Jennifer] a bit." Brown also left Jennifer a voicemail that day, stating that he did not regret "last night's little ordeal" because she "deserve[d] everything [she] got out of it." In a phone call between Brown and his friend, Brown admitted to "spank[ing] [Jennifer's] ass" and "pick[ing] up [his] belt and . . . whoop[ing] her a couple times." In a call between Brown and his mother, Brown admitted to "spanking" Jennifer.

Law enforcement testified that, when conducting a search of Brown's bedroom, they found a piece of duct tape on top of the dresser, as well as a roll of duct tape in the dresser drawer. There were also leather belts located in the bedroom, and a red substance of what law enforcement presumed to be blood on the bed sheet. Brown argues that there was "no forensic evidence to corroborate [Jennifer's] story." Brief for appellant at 15. He points out that law enforcement "did not submit the belts . . . for forensic testing," nor was any "testing" completed on the red substance on the bed sheet. *Id.* However, even without "forensic evidence," there was ample other evidence presented at trial from which a rational fact finder could conclude beyond a reasonable doubt that Brown caused Jennifer bodily injury, threatened her with bodily injury, or threatened her in a menacing manner.

Viewing the evidence in the light most favorable to the State, we find the evidence was sufficient to support the jury's finding that Brown was guilty of third degree domestic assault.

EXCESSIVE SENTENCE

Brown also claims the district court imposed an excessive sentence. Brown was convicted of third degree domestic assault, a Class I misdemeanor, pursuant to § 28-323. A Class I misdemeanor is punishable by up to 1 year of imprisonment, a $1,000 fine, or both. See Neb. Rev. Stat. § 28-106(1) (Reissue 2016). The district court sentenced Brown to 365 days' imprisonment, which is within the statutory range. As such, we review the district court's sentencing determination only for an abuse of discretion.

When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the crime. *State v. Lierman, supra*. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

Brown was 50 years old at the time of sentencing. According to the presentence investigation report (PSR), Brown graduated from high school and completed some college courses. Brown's criminal history includes convictions for the following: "DUI" in 1992 (9 months' probation, $300 fine, 60-day impoundment); "DUI-.15+ -1 Prior Conviction" in 2007 ($500 fine, 15 months' probation, 1 year impound license, 2 days' house arrest); and "Child Abuse" in 2019 ($1,000 fine). Brown also had convictions for multiple traffic offenses.

Brown did not participate in the presentence investigation interview with the probation officer for this case. However, attached to the current PSR was a prior PSR from 2021 related to Brown's conviction for child abuse. That conviction stemmed from an incident in November 2019 when Brown was found convulsing and unresponsive, apparently from drugs he had taken. The

children were in his care at the time. The prior presentence investigation was ordered in November 2020 and Brown was interviewed in December. According to that PSR, Brown had been self-employed for over 10 years at Brown Construction, and he had a history of drug use.

Included in the PSR is the "Defendant's Statement" for the current case. The handwritten statement, dated "7/14/22," reads in part,

Arguments between parents got out of control . . . . Jenn had been gone up to 2 months at a time and in my opinion a [sic] lackadazical [sic] mother. She did not like the fact that I wanted her to answer for her unaccountability so she retaliated by presenting this case to her lawyer.

Brown further stated that his children's grades were "suffering and their social skills [were] diminishing" without him. He urged the court to "take into consideration tha[t] [his] children are [his] life."

The current PSR included a victim impact statement from Jennifer. She stated that although the November 16, 2020, incident "was not the first time [she] had experienced abuse from [Brown], it was by far the worst and the first time [she] was brave enough to report the abuse." She stated that she and the children had "been experiencing nightmares, severe anxiety, depression and even full-blown panic attacks." She further stated that although she "had protection orders in place since this incident," Brown was granted supervised visitation in the divorce; he continually tried to make contact with the children and made multiple threats about taking the children from her. This made the children and Jennifer feel unsafe. Jennifer urged the court to impose "the maximum punishment possible" so she and the children could "try to live a normal life."

The PSR also included victim impact statements from T.B. and R.B. In his victim impact statement, T.B. stated that because of what happened, he had trouble with "stress, anxiety, looking over [his] shoulder, and sleeping." He further stated that "what happened that night has been going on for years prior" but they "were too scared of [Brown] to" do anything. T.B. stated that he hoped Brown would "learn he isn't the 'good guy' he believes he is and that he can't blame everyone for his actions." He thought Brown deserved a sentence of prison or jail time, a fine, and to see a doctor or therapist for counseling or other treatment. In R.B.'s victim impact statement, R.B. drew a picture, which she labeled "dad hitting mom."

At the sentencing hearing, defense counsel acknowledged that Brown had a prior conviction for child abuse but noted that Brown "doesn't have any prior felony convictions" or "crimes of violence on his record." Counsel pointed out that Brown previously successfully completed probation on two separate occasions. Counsel asked that the court "not give[] any weight to the allegations that underlie the felony charges that [Brown] originally faced" because "[t]he jury acquitted him of all the more serious allegations." Counsel further noted that the offense took place 2 years prior to sentencing and Brown had not "gotten in legal trouble" in that time. Counsel also noted that Brown had run a construction business for 22 years. Counsel requested that the court impose "a sentence of time served with a . . . maximum fine of $1000" and, "[i]f the Court believes additional jail time is necessary, . . . no more than 90 days."

The State pointed out that Brown did not participate in the presentence investigation interview, nor did he "seem to take responsibility for [the] offense." The State argued that Brown "consistently downplay[ed] the seriousness" of his actions, and noted that in his written statement,

Brown "talk[ed] about [Jennifer] and what he fe[lt] that she ha[d] done wrong." The State urged the court to consider the victim impact statements and requested that the court impose a "maximum jail sentence of a year in jail."

The district court observed that it had "a front row seat to the jury trial . . . and although the jury did find [Brown] guilty of the lesser included offense of 3rd Degree Domestic Violence, a Class I Misdemeanor," that does not "negate[] the severity of the assault and the injury" and "it's just as probable that [the jury] believed that it wasn't a serious bodily injury." The court considered all the information contained in the PSR, including the indication that "during this time period . . . Brown was involved with drugs," including methamphetamine. The court placed "great weight upon the victim impact statements of not only [Jennifer] but also of the children." The court found "that imprisonment . . . [was] necessary for the protection of the public" and "a lesser sentence would depreciate the seriousness of the . . . crime and promote disrespect for the law." The court then sentenced Brown as previously set forth.

In his brief on appeal, Brown claims the district court abused its discretion when it improperly "gave weight to the allegations underlying the felony charges [Brown] originally faced." Brief for appellant at 19. As evidence of this, he points out the court's comments during sentencing set forth above. However, the court's comments merely indicate that it considered the circumstances surrounding the offense and the severity of the assault, both of which are relevant to the factors of "the nature of the offense" and "the violence involved in the commission of the crime." See *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020).

Brown also argues that the district court failed to "give adequate weight to . . . [Brown's] criminal record" and his "rehabilitative needs." Brief for appellant at 18. Further, he claims the court failed to "allocate proper weight to the circumstances of [Brown's] life." *Id.* Specifically, he contends the court failed to consider that Brown has a construction company which employs others "and has had a positive impact on the community." *Id.* at 19. At the sentencing hearing, the court expressly stated that, in crafting an appropriate sentence, it had considered the information contained in the PSR. The PSR contains all the information regarding Brown's individual circumstances that he highlights in his brief on appeal.

The district court appropriately considered the seriousness of Brown's offense and his individual circumstances. Because the appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life, a sentencing court is accorded very wide discretion in imposing a sentence. See *State v. Rogers*, 297 Neb. 265, 899 N.W.2d 626 (2017). Accordingly, we cannot say that the court abused its discretion in sentencing Brown to serve 365 days' imprisonment.

CONCLUSION

For the reasons set forth above, we affirm Brown's conviction and the sentence imposed by the district court.

AFFIRMED.