IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. EHRLICH


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

JEFFREY EHRLICH, APPELLANT.


Filed October 5, 2021.    No. A-20-730.


Appeal from the District Court for Saunders County: CHRISTINA M. MARROQUIN, Judge. Affirmed.

Thomas J. Klein, Saunders County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.


PIRTLE, Chief Judge, and MOORE and WELCH, Judges.

MOORE, Judge.

## I. INTRODUCTION

In these consolidated cases, Jeffrey Ehrlich appeals from his convictions in the District Court for Saunders County, of two counts of terroristic threats, two counts of use of a deadly weapon to commit a felony, and one count of child abuse. Ehrlich challenges the sufficiency of the evidence to support his convictions and the sentences imposed. For the following reasons, we affirm.

## II. STATEMENT OF FACTS

### 1. PROCEDURAL BACKGROUND

On August 19, 2019, Ehrlich was charged by information with one count each of attempted first degree murder, assault on an officer in the third degree, terroristic threats, and child abuse, and two counts of use of a deadly weapon to commit a felony. The information was amended on

- 1 -

February 10, 2020, charging Ehrlich with one count each of attempted first degree murder, assault on an officer in the third degree, and child abuse; three counts of terroristic threats; and four counts of use of a deadly weapon to commit a felony. Ehrlich entered not guilty pleas to all charges.

Venue was changed for trial from Saunders County to the Seward County district court. A jury trial was held August 25 through 27, 2020. The following evidence was received at trial.

## 2. FACTUAL BACKGROUND

### (a) Altercation With T.E.

Ehrlich's son, T.E., testified that on August 13, 2019, he had a disagreement with Ehrlich during dinner. T.E. testified that he become angry after Ehrlich punched him twice, once playfully and once "a little too hard." T.E. then pushed Ehrlich from the dining room of the house into the next room, which was Ehrlich's bedroom. T.E. pushed Ehrlich again, this time into a dresser and causing Ehrlich to bleed from his forehead. T.E. testified that Ehrlich became angry that T.E. caused him to bleed and threw a candle and plate of spaghetti at T.E., breaking a window, getting spaghetti on the walls, and getting hot wax on T.E.'s arm. Pictures of a broken window and a wall with spaghetti on it were entered into evidence.

T.E. went to a neighbor's house to ask for help, however, this attempt was unsuccessful. T.E. returned home, at which time Ehrlich pushed him against the porch railing and punched him in the face three times. Pictures were entered into evidence showing bruises on T.E.'s face, shoulder, and back, which T.E. testified were caused by Ehrlich punching him and pushing him against the porch railing. T.E. then called his friend's father, Bryan Divis, and asked to be picked up as quickly as possible. Divis testified that he could hear Ehrlich yelling at T.E. in the background during the phone call. Divis immediately went to pick up T.E. from Ehrlich's house. Divis observed broken glass on the front porch. Divis testified that when he opened the door, Ehrlich was standing inside the house, holding a baseball bat, and warning Divis not to come inside. Ehrlich allowed T.E. to leave with Divis. After leaving the house, Divis observed red marks on T.E.'s back and neck, and said that T.E. seemed shaken up by the incident. Divis' wife testified that T.E. seemed "distraught" by the situation.

### (b) Altercation With Chad Dailey

Chad Dailey testified that he was walking his dog past Ehrlich's residence on August 13, 2019, when he heard the sound of glass breaking and something heavy falling. Dailey was unable to identify the source of the sound and kept walking. As he was walking, he heard someone repeatedly shout "what the fuck are you looking at" and "get off my block." Dailey testified that after crossing the street, he encountered Ehrlich rapidly moving in his direction, holding a baseball bat. Dailey attempted to walk away from Ehrlich and asked a neighbor who was outside to call the police. Dailey testified that at this point, Ehrlich was standing approximately 3 feet away and raised the baseball bat as if he were going to swing it at Dailey and his dog. Before Ehrlich could swing, a nearby neighbor said she was calling the police and Ehrlich turned and left the scene.

Janice Schliefert testified that she was sitting on her front porch the night of August 13 and heard the sound of a man screaming and glass breaking coming from Ehrlich's house. She also testified that she saw Dailey walking his dog, heard Ehrlich yell at Dailey, and watched Ehrlich leave the house and follow Dailey down the street, yelling and holding a baseball bat. Schliefert

then saw Ehrlich raise the baseball bat above his head like he was going to hit Dailey and described Ehrlich's demeanor as "a little on the aggressive side." Schliefert testified that Ehrlich walked away and she called 911 on Dailey's behalf.

Another neighbor, Abby Bergert, testified that she saw Ehrlich earlier in the day on August 13, when he told her "something about finishing off a bottle of red" which she assumed meant he had been drinking wine. She testified that later that evening, she saw Ehrlich holding a bat and walking toward another man who was walking a dog on the street. She testified that Ehrlich appeared angry, she heard a lot of yelling, and she called 911. A copy of the audio from the 911 call was received into evidence. Bergert observed two police cars arrive at Ehrlich's house.

### (c) Altercation With Officer Martin and Deputy Haiar

Officer Ryan Martin testified that he arrived on the scene in Ehrlich's neighborhood after receiving a call for assistance that included reports of a man chasing another man down the street with a baseball bat. Martin talked to Dailey who recounted his earlier interaction with Ehrlich. Martin said that he is familiar with Ehrlich and that the Wahoo Police Department has a policy that backup is needed whenever an officer deals with him because incidents with Ehrlich typically become physical and require multiple people to restrain him. Martin called for backup once he identified that Ehrlich was involved, and Deputy James Haiar arrived to assist him.

The officers parked their vehicles in front of Ehrlich's house. Martin and Haiar both testified that upon arriving at Ehrlich's home, they noticed a broken window and a candle on the front porch, and some furniture overturned in front of the home. The officers also checked the back of the home but were unable to locate Ehrlich. Martin testified that after his initial check of Ehrlich's home, he talked to Bergert who relayed the earlier events to him.

While talking to Bergert, the officers saw a semi-truck come around the corner and appear at the bottom of the hill, which Martin recognized as Ehrlich's vehicle. Ehrlich drove the semi-truck up the street, parked, and got out. Both Martin and Haiar approached Ehrlich's semi-truck, with Haiar in front of Officer Martin. Martin testified that Ehrlich held a baseball bat over his head as if he was getting ready to swing it and began talking to Haiar. Ehrlich then pointed the baseball bat at Martin before walking backwards to get back in the semi-truck. Martin testified that he was unable to hear what Ehrlich said to Haiar at this time, but he thought that Ehrlich was trying to get both officers closer together so he could attack both of them at once. Martin testified that he was concerned about the risk elevating and wanted to deescalate the situation, but the closer he got to Ehrlich, the angrier Ehrlich appeared.

Martin testified that while in the truck, Ehrlich was staring at him and turning the wheels of the semi-truck toward him. Martin moved toward a large tree, and Ehrlich put the semi-truck in gear and started driving toward Martin. The semi-truck got within 12 to 18 inches of Martin's body before he was able to dive behind a tree for protection. Martin injured his back in the process. Martin testified that as he was getting up, Ehrlich continued to drive the semi-truck through the yard, back down the street, and then came back around a corner toward the officers again. Martin testified that Ehrlich briefly slowed the semi-truck, before hitting the gas and driving the semi-truck directly into both his and Haiar's police cruisers. Both cruisers were damaged and possibly totaled. Martin testified that after Ehrlich hit the police cruisers, he exited the semi-truck and began yelling at Haiar. Because of his back pain, Martin was unable to move as quickly as

Haiar in attempts to approach Ehrlich. According to Haiar, Ehrlich was saying that he was going to kill Martin. Haiar testified that he felt threatened at the time. Haiar attempted to stop Ehrlich from advancing toward Martin. Martin testified that he overheard Ehrlich yelling that he hated the Wahoo Police Department and observed him poking Haiar in the stomach with a baseball bat. Haiar told Ehrlich to put the bat down multiple times and was finally able to grab the bat and get it away from Ehrlich. Martin was able to pull Ehrlich away from Deputy Haiar and draw him back. Ehrlich attempted to run away before Haiar tackled him, and Ehrlich began wrestling with the deputy. Ehrlich struck Haiar, knocking his body camera off and hitting him in the jaw. Martin assisted Haiar in arresting Ehrlich.

Videos of these events captured by both officers' body cameras were entered into evidence. Martin's body camera video shows Ehrlich repeatedly shouting obscenities and telling the officers that he hated them. Haiar's body camera video shows Ehrlich telling the officers to "bring [their] guns out" and showed Ehrlich threatening the officers with a baseball bat, attempting to push Haiar, and stating that he was going to kill Martin.

### (d) Post-Altercation and Ehrlich's Testimony

Kimberly Pohlman, a nurse who treated Ehrlich after his arrest, testified that Ehrlich was very coherent but did have slurred speech when talking with her. Ehrlich told her that he did not like the Wahoo Police Department and that he believed all of the officers were corrupt. Ehrlich also told Pohlman that he would kill all of the Wahoo Police Department if he could and said that he aimed his semi-truck at the police and wanted to kill them all. Polhman testified that Ehrlich repeated the story over and over and was rocking back and forth. In Pohlman's assessment of Ehrlich, she opined that Ehrlich was not suicidal at the time. Pohlman also testified that Ehrlich never complained of memory loss, never answered questions in a way that suggested he could not remember something, and was able to answer questions without any problem.

Ehrlich testified that after T.E.'s mother was diagnosed with cancer and passed away in January 2019, he had trouble with not being able to sleep or focus. When asked to recount the events of August 13, Ehrlich stated he didn't remember certain parts of the evening such as cooking dinner, but that he did remember other parts including some of the altercation with T.E., standing in his backyard with a baseball bat, being in his semi-truck, and seeing the police cruisers in front of his home. Ehrlich also remembered getting out of his truck with a bat and then getting back in his truck, and thinking the officers were going to shoot him. Ehrlich testified his next memory after that was when he was arrested. Ehrlich testified that although he had been having problems with memory loss, he did not ask anyone for help because he believed it was his own battle. Ehrlich testified that he was prescribed medication to help him sleep and described himself as "a nicer man" and happier when he takes his medication.

Regarding the events on August 13, Ehrlich said that although he didn't remember punching T.E. in the face, he took responsibility for that action. He also admitted that he does not like the Wahoo Police Department and agreed that his behavior, as described by Martin's and Haiar's testimonies, was threatening.

### 3. VERDICT AND SENTENCE

The jury convicted Ehrlich of third degree assault on an officer, with Haiar as a victim; two counts of terroristic threats, with Martin and Haiar being the victims; two counts of use of a deadly weapon to commit a felony related to the terroristic threat charges; and one count of child abuse. The jury acquitted Ehrlich of the charges of terroristic threats toward Dailey and use of a deadly weapon to do so. The jury was deadlocked and unable to reach a verdict on the charges of attempted first degree murder of Martin and one count of use of a deadly weapon to do so, and the district court declared a mistrial as to those counts.

A sentencing hearing was held on October 5, 2020. For the charges of assault on an officer in the third degree, terroristic threats, and child abuse, all class IIIA felonies, Ehrlich was sentenced to 1 year of imprisonment each. For each charge of use of a deadly weapon to commit a felony, class II felonies, Ehrlich was sentenced to a period of 5 to 6 years of imprisonment. All of the charges for which Ehrlich was sentenced to 1 year of imprisonment were ordered to run concurrently with each other. The use of a deadly weapon charge in Count 5 (relating to terroristic threats against Martin) was ordered to be served consecutively to the 1-year sentences, and the use of a deadly weapon charge in Count 8 (relating to terroristic threats against Haiar) was ordered to run consecutively to all counts. Ehrlich was granted 419 days of credit for time served.

Ehrlich now appeals.

## III. ASSIGNMENTS OF ERROR

Combined, reordered, and restated, Ehrlich assigns that the evidence was insufficient to convict him of the charges of terroristic threats, use of a deadly weapon to commit a felony, and child abuse. Ehrlich also assigns that the sentences imposed were excessive and constituted an abuse of discretion by the trial court.

## IV. STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finder of fact. *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

Absent an abuse of discretion by the trial court, an appellate court will not disturb a sentence imposed within the statutory limits. *State v. Wheeler*, 308 Neb. 708, 956 N.W.2d 708 (2021). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

## V. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

#### (a) Terroristic Threats

Neb. Rev. Stat. § 28-311.01 (Reissue 2016), provides in relevant part:

> (1) A person commits terroristic threats if he or she threatens to commit any crime of violence:
>
> (a) With the intent to terrorize another;
>
> (b) With the intent of causing the evacuation of a building, place of assembly, or facility of public transportation; or
>
> (c) In reckless disregard of the risk of causing such terror or evacuation.

A "crime of violence" is an act which injures or abuses through the use of physical force. *State v. Tucker*, 17 Neb. App. 487, 764 N.W.2d 137 (2009). A defendant does not have to actually commit a crime of violence, because it is the threat of violence that is at the heart of the crime of terroristic threats. *Id*. Terroristic threat cases will largely be determined by the context of the interaction between the involved people. *Id*.

Viewing the evidence in the light most favorable to the prosecution, the evidence was sufficient to find that the elements of terroristic threats were proven in this case.

#### (i) Officer Martin

The record shows that Ehrlich drove his semi-truck in the direction of Martin, specifically pointing the wheels of the truck at Martin. Ehrlich barely missed striking Martin after he dove behind a tree. Ehrlich continued on his rampage with the truck, crashing it into Martin's police cruiser and causing significant damage. Although Martin was unable to hear a lot of what Ehrlich was saying, he did clearly hear Ehrlich say that he did not like the Wahoo Police Department and observed Ehrlich's angry behavior. Martin's own body camera footage shows Ehrlich shouting obscenities while approaching Martin with a baseball bat.

Ehrlich argues that although there is evidence he told Haiar that he was going to kill Martin, it is impossible for that to be considered a threat of a crime of violence because Martin did not hear the threat. To threaten is commonly understood to mean promising punishment, reprisal, or distress. See *State v. Curlile*, 11 Neb. App. 52, 642 N.W.2d 517 (2002). For purposes of § 28-311.01, a threat may be written, oral, physical, or any combination thereof. *State v. Curlile, supra.* We find that Ehrlich's verbal assault, together with his other actions of driving his semi-truck at Martin and approaching Martin with a baseball bat in an aggressive manner, were sufficient to prove that he threatened a crime of violence against Martin.

Ehrlich also argues that he lacked the requisite intent for terroristic threats, because although his statements regarding wanting to kill Martin may have been reckless, they do not rise to the level of an intentional act. However, a direct expression of intention by the actor is not required because the intent with which an act is committed involves a mental process and intent may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident. *State v. Tucker, supra*. Whether a defendant possesses the requisite state of mind is a question of fact and may be proven by circumstantial evidence. *Id*. The evidence here shows that

after yelling at Martin and making statements to Haiar about wanting to kill Martin, Ehrlich engaged in several behaviors that threatened violence toward Martin including driving a semi-truck toward him, crashing the semi-truck into Martin's vehicle, approaching Martin with a baseball bat, and directly telling Martin that he hated him. All of these actions support the conclusion that Ehrlich acted intentionally.

### (ii) Deputy Haiar

The evidence shows that Ehrlich repeatedly yelled at Haiar, crashed a semi-truck into Haiar's police cruiser, and approached Haiar with a baseball bat. Video footage from Haiar's body camera also shows that Ehrlich attempted to push Haiar and repeatedly shouted obscenities at him, including comments that he hated the Wahoo Police Department. Ehrlich argues that he never made any verbal statement threatening violence toward Haiar, and therefore did not terrorize him. However, as we noted above, threats are not limited to express, verbal statements threatening violence. Ehrlich's physical actions and anger toward Haiar throughout the whole interaction are sufficient to show that Ehrlich threatened a crime of violence. Ehrlich again contends that he lacked the requisite intent to terrorize Haiar, as his actions were merely reckless rather than intentional. Ehrlich verbally taunted Haiar, raised a baseball bat toward him, and pushed him. These actions are sufficient to show that Ehrlich intended to cause terror to Haiar.

### (b) Use of Deadly Weapon to Commit Felony

Neb. Rev. Stat. § 28-1205 (Reissue 2016), provides in relevant part that "[a]ny person who uses a firearm, a knife, brass or iron knuckles, or any other deadly weapon to commit any felony which may be prosecuted in a court of this state commits the offense of use of a deadly weapon to commit a felony." Ehrlich argues that, because there was insufficient evidence to support convictions of terroristic threats, the use of a deadly weapon convictions are voidable and must be set aside. However, as we determined above, there was sufficient evidence to support both charges of terroristic threats, and therefore the use of a deadly weapon to commit a felony charges are not automatically voidable.

The evidence is clear that Ehrlich carried a baseball bat throughout the majority of his interactions with Martin and Haiar and repeatedly pointed the bat at the officers, raised it as if he was going to swing it, and refused to put it down when the officers demanded. Therefore, the evidence is clear that Ehrlich used the baseball bat while committing the crime of terroristic threats against both Martin and Haiar.

Ehrlich argues that a baseball bat is not a weapon specifically listed in § 28-1205, and that a baseball bat is most commonly used as sporting equipment. Neb. Rev. Stat. § 28-109(8) (Reissue 2016) provides that in the context of the Nebraska Criminal Code, "deadly weapon" is defined as "any firearm, knife, bludgeon, or other device, instrument, material, or substance, whether animate or inanimate, which in the manner it is used or intended to be used is capable of producing death or serious bodily injury." It is a clear that a baseball bat is an instrument that has the potential to cause serious bodily injury when used to strike a person.

Ehrlich also contends that he only carried the baseball bat and did not swing it or otherwise "use" it in the context of § 28-1205(1). The Nebraska Supreme Court has determined that the term "use" requires more than mere possession, for purposes of § 28-1205(1). *State v. Garza*, 256 Neb.

752, 592 N.W.2d 485 (1999). Use requires a weapon to be actively employed in a way that makes it an operative factor in the offense, such as by brandishing, displaying, striking with, or firing or attempting to fire the firearm. *Id*. Here, the evidence shows that the baseball bat was not merely in Ehrlich's possession, but that he was displaying it to the officers, using it to gesture at the officers, and raising it up as if he was going to swing it, all while he was yelling obscenities at the officers and threatening to kill Martin. Therefore, we cannot say that the district court erred in finding that evidence was sufficient to prove that Ehrlich used a baseball bat as a deadly weapon when committing the crimes of terroristic threats.

Ehrlich again contends that he did not have the requisite criminal intent when he possessed the baseball bat. However, during Ehrlich's interactions with the officers, he refused to put the baseball bat down despite Haiar's instructions to do so. He also raised the bat up while yelling at Haiar and advanced toward Martin while holding the bat. These actions are sufficient to find that Ehrlich intended the bat to carry the threat of a weapon.

For these reasons, we find that the evidence was sufficient to convict Ehrlich of using a deadly weapon to commit a felony in connection with each of the terroristic threat charges.

### (c) Child Abuse

Neb. Rev. Stat. § 28-707 (Reissue 2016) provides, in relevant part:
> (1) A person commits child abuse if he or she knowingly, intentionally, or negligently causes or permits a minor child to be:
> (a) Placed in a situation that endangers his or her life or physical or mental health.

Neb. Rev. Stat. § 28-707(b) and (c) also include cruel punishment, deprivation of necessary food, shelter, clothing, or care in the definition of child abuse. "Endangers" for purposes of § 28-707(1)(a) means to expose a minor child's life or health to danger or the peril of probable harm or loss. *State v. Mendez-Osorio*, 297 Neb. 520, 900 N.W.2d 776 (2017). The Nebraska Supreme Court has recognized that the purpose of criminalizing conduct under the statute is that where a child is endangered, it may be injured; it is the likelihood of injury against which the statute speaks. *Id*. Criminal endangerment in § 28-707(1)(a) encompasses not only conduct directed at the child but also conduct which presents the likelihood of injury due to the child's having been placed in a situation caused by the defendant's conduct. *State v. Ferguson*, 301 Neb. 697, 919 N.W.2d 863 (2018).

Ehrlich argues that the evidence was insufficient to support the conviction for child abuse because there was no evidence presented that T.E. needed medical care or that any medical professional testified that T.E.'s physical or mental health was endangered. We disagree. The evidence presented was that Ehrlich threw a candle and a plate of spaghetti at T.E., punched T.E. in the face three times, and forcefully held him against the porch railing. The candle was thrown with enough force to break through a glass window. T.E. resorted to seeking help from a friend's parents, who described T.E. as shaken up and distraught. At trial, Ehrlich did not deny punching T.E. in the face. Clearly, the evidence was sufficient to conclude that Ehrlich placed T.E. in a situation in which his physical or mental health was endangered.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Becker,* 304 Neb. 693, 936 N.W.2d 505 (2019). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id*. However, the sentencing court is not limited to any mathematically applied set of factors. *State v. Majikian*, 303 Neb. 100, 927 N.W.2d 48 (2019). The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

Ehrlich was convicted of assault on an officer, two counts of terroristic threats, and one count of child abuse, all of which are class IIIA felonies. A Class IIIA felony is punishable by a maximum of 3 years' imprisonment with no minimum sentence required. Neb. Rev. Stat. § 28-105 (Cum. Supp. 2020). Here, Ehrlich was sentenced to 1 year's imprisonment for each conviction, which is within the statutory limits. Ehrlich was also convicted of two counts of use of a deadly weapon to commit a felony, Class II felonies. A Class II felony is punishable by a maximum of 50 years' imprisonment and a minimum sentence of 1 year imprisonment. Neb. Rev. Stat. §28-105 (Cum. Supp. 2020). For each conviction of a Class II felony, Ehrlich received a sentence of 5 to 6 years' imprisonment, which is also well within the statutory limits. Because the sentences imposed were all within the statutory limits, we turn to examine the relevant factors in order to determine if the sentences nevertheless constituted an abuse of discretion.

The presentence investigation report (PSI) reveals that Ehrlich was 60 years old at the time of the offense. Ehrlich dropped out of high school in 10th grade before obtaining his GED in 1979 and enlisting in the United States Navy. Ehrlich was previously employed in the construction industry and was working as a truckdriver for the 3 years prior to the incident. Ehrlich's criminal history includes convictions for probation violation in Colorado in 1993 for which he received 30 days in jail, attempt of a Class IV felony (amended from criminal nonsupport/violate court order) in 2006 for which he received a period of 18 months of probation that was revoked resulting in a year spent in jail, disturbing the peace (amended from stalking) in 2007 for which he received a fine, trespass in 2008 for which he received a fine, assault and battery in 2008 for which he received probation but was unsatisfactorily released in 2010, terroristic threats in 2008 for which he received 1 year in jail, attempt of a Class IIIA or IV felony (amended from assault by confined person) in 2008 which resulted in another 12 months in jail, trespass and failure to appear in 2009 which both resulted in fines, driving under suspension in 2011 for which he received a fine, obstructing a peace officer (amended from resisting arrest) in 2015 for which he received a fine, and littering (amended from theft of services) in 2015 for which he received a fine.

Overall, the Level of Service/Case Management Inventory assessment concluded that Ehrlich was at a very high risk to reoffend. He scored in the maximum risk category for the areas of alcohol, drugs, violence, antisocial, and stress coping. He scored in the high risk category for

criminal history, family/marital, leisure/recreation, pro-criminal attitude/orientation, and antisocial behavior. Ehrlich's probation officer also noted that Ehrlich minimized his actions and responsibility in the present case.

The record shows that the district court reviewed the PSI and considered the relevant sentencing factors. The court did acknowledge that at the time of the offenses, Ehrlich was grief-stricken by the death of T.E.'s mother and that grief can cause mental health issues. However, the court noted that this did not excuse his actions. The court also noted that based on Ehrlich's history, he had a pattern of behavior that poses a risk to the public. Based on this record, we cannot say that the district court abused its discretion in the sentences imposed.

## VI. CONCLUSION

For the reasons set forth above, we affirm the decision of the district court.

AFFIRMED.