IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. PIERCE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

DUSTIN S. PIERCE, APPELLANT.

Filed April 5, 2022.    No. A-21-679.

Appeal from the District Court for Nemaha County: JULIE D. SMITH, Judge. Affirmed.

Keith M. Kollasch, Nemaha County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

MOORE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Following a bench trial in the Nemaha County District Court, Dustin S. Pierce was convicted of one count of leaving the scene of a personal injury accident resulting in serious bodily injury and one count of tampering with physical evidence. On appeal, Pierce claims the district court erred in overruling his objections to the testimony of the State's accident reconstruction expert witness and in failing to sufficiently explain its rationale in overruling those objections. He also asserts that there was insufficient evidence to support his convictions. We affirm.

## II. BACKGROUND

### 1. FACTUAL BACKGROUND

On June 23, 2020, the State filed an information charging Pierce with count I, leaving the scene of a personal injury accident, a Class III felony, in violation of Neb. Rev. Stat. § 60-697

(Cum. Supp. 2018), and count II, tampering with physical evidence, a Class IV felony, in violation of Neb. Rev. Stat. § 28-922 (Cum. Supp. 2020).

The charges in this case stem from a motor vehicle accident occurring on May 10, 2020, in Nemaha County, Nebraska. That evening, between 8 and 8:20 p.m., Katelynne Moore left her home to go for a walk along a road going east (the bypass) just outside of Auburn, Nebraska. During her walk, she sent her husband a text message just after 8:15 p.m. Between that time and approximately 9 p.m., Moore was struck by an automobile while she was walking along the bypass.

Just after 9 p.m., a high school student discovered Moore lying unconscious in the ditch on the north side of the bypass as well as multiple pieces of debris scattered nearby. He had left his home at approximately 8:45 p.m. to go for a bike ride, and as he initially traveled east along the bypass, he did not observe any person or debris in the road. About 8 minutes after he left his home, he observed a "gray car" traveling southbound on an intersecting road, and the gray car turned west at the bypass intersection towards Auburn. The student continued biking east for approximately 7 minutes before turning around to return to Auburn, and he observed a red truck just before beginning the return trip. As he drew closer to Auburn, he noticed a pair of glasses and several "car parts" in the road, and as he looked around, he saw Moore unconscious in a ditch on the north side of the road.

The student flagged down an approaching vehicle for assistance, and emergency services were contacted. Upon their arrival, emergency responders began rendering aid. According to witnesses present at the scene of the accident, it was generally dark but still light enough to see without flashlights or other artificial light. Moore remained unconscious and unresponsive despite the paramedics' efforts, and she exhibited numerous abrasions on her body, a "severe laceration" on the back of her head, and bleeding from her ear. She was immediately transported to a local hospital for emergency care and subsequently transferred to a different hospital for continuing care and treatment. The trauma surgeon responsible for Moore's care described that her injuries were consistent with a pedestrian struck by a motor vehicle and "involved a substantial risk of death."

Early the next morning, law enforcement secured several car parts found at the accident site, including a broken passenger-side headlight and various internal and external pieces. Based on serial numbers identified on the various parts, law enforcement believed the vehicle involved in this accident to be a "2010 to 2012 Ford Fusion with a gray bumper." This description was used to identify local individuals whose vehicle registration matched this description. Pierce, who owned a gray 2011 Ford Fusion, was subsequently identified as a suspect in this case. On May 13, 2020, law enforcement executed a search warrant of the one-car garage attached to Pierce's residence in an effort to locate his vehicle. The garage had an overhead garage door without an external mechanism to open the door, an outside back door, an internal door leading into the residence, and two windows. Law enforcement was initially unable to open the back door, and the windows were covered by black plastic bags taped to the window frames. Entering the garage through a window, law enforcement discovered that the garage's back door had been effectively locked by a "piece of wood . . . screwed into the doorjamb," in addition to several items blocking the door from the inside such as rocks and pieces of equipment.

After gaining access to the garage, law enforcement located Pierce's vehicle. The vehicle had substantial damage to its front side exterior; the passenger-side headlight was missing, the hood had numerous indentations, portions of the vehicle's frame underneath the missing headlight

were also missing, and the vehicle's internal mechanisms were exposed. The windshield had also been fractured on the passenger side, and the "A-pillar" of the passenger door had a significant indentation next to the windshield fracture. Law enforcement took numerous photographs of the damage to Pierce's vehicle, and these photographs are included in the record.

That same day, law enforcement interviewed Pierce. Pierce initially stated that he had not struck anything on the bypass. Rather, he claimed that he hit a deer earlier on May 10, 2020, as he was driving back to Auburn from Rockport, Missouri. He described that he was driving on "Highway 136" at approximately 70 miles per hour, and the deer "impacted the front of [his] car, flipped up the hood, hit the windshield, . . . landed on all fours," and ran off before Pierce could bring his vehicle to a complete stop with "no blood on the highway [and] no blood [or fur] on [his] car." He acknowledged that he took the bypass into Auburn that evening in order to avoid law enforcement "because [he] had a headlight out."

Upon further questioning by the two law enforcement officers interviewing him, Pierce conceded that he "made . . . up" the deer collision and had in fact hit something on the bypass just outside of Auburn, but he "didn't know what he hit" because he was looking at his cell phone at the time of the impact. He recalled that he did not stop after the collision because he thought he had hit a "coyote," a "deer," or some other animal. Immediately after the impact, Pierce observed part of his passenger side headlight detach from his vehicle in his passenger-side mirror and felt what he believed to be his "fender" go underneath his vehicle. He stated that it was "getting dark" at the time of the impact, and he stopped at two convenience stores before going home. Pierce emphasized that he did not know what he hit, and he did not report the impact due to his fear of a "shakedown" by law enforcement.

## 2. Trial

A bench trial was held on May 13 and 14, 2021. The State called multiple witnesses to testify, and Pierce testified on his own behalf. Most of the witnesses called by the State testified to matters we have previously described, and we set forth summaries of those witnesses who testified to matters not yet discussed as relevant to the issues on appeal.

### (a) Megan Culver

Megan Culver (Megan) was Pierce's girlfriend at the time of the accident, although they had separated by the time of trial. She previously lived with Pierce, and she testified that Pierce left the residence during the afternoon of May 10, 2020, to travel to Missouri. At approximately 8:55 p.m. on May 10, Pierce called her from a convenience store and told her that "he hit a deer . . . and . . . wasn't sure if he was going to be able to" pick up the sandwiches they had ordered that night before returning home. Megan noted that Pierce was "upset" when he came home, and she attributed this to the damage to his vehicle.

The following day, Pierce told Megan that he hit the deer "between Brownville and Peru" on Highway 136 and "saw the deer stagger away." Pierce also told Megan that his sister informed him that "a woman . . . had been hit" in "a hit-and-run" on the bypass and "the rumor was that [Pierce] had hit a person on the [bypass]." Megan testified that Pierce became "very, very distraught and scared" after the conversation with his sister, and he later put garbage bags over the garage windows after a phone call with his father. Pierce thereafter left with his father "to see the

scene of the accident" on the bypass; Megan did not go with them. Pierce, his father, and Megan later drove together to Missouri, and Pierce pointed out "two separate locations" "off of Highway 136" where "he had hit the deer the night before."

The next day, May 12, 2020, Megan recalled that she and Pierce discussed the damage to his vehicle. He drew her attention to the fractures on his windshield and "pointed [to] where the antlers probably went through the windshield," although she "didn't pay much attention" because she was in "a lot [of] distress" and "just wanted to believe" what he told her. At some point after this conversation, Megan told Pierce "that he should go talk to law enforcement," and he became "very upset" at that suggestion.

(b) Sheriff Brent Lottman

Nemaha County Sheriff Brent Lottman was called to testify as an "accident reconstruction" expert witness. Pierce's trial counsel objected to Lottman's testimony under the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and the district court overruled these objections. We will describe these objections, Lottman's relevant testimony, and the district court's rulings regarding these objections in further detail in our analysis below.

Pursuant to the investigation of the accident, Lottman examined the damage to Pierce's Ford Fusion. He generally noted that the damage to Pierce's vehicle was consistent with the damage expected in a collision involving a pedestrian and a motor vehicle. During his testimony, Lottman focused primarily on the damage done to the front passenger side "A-pillar" and windshield. With respect to the A-pillar, Lottman affirmed that there was an "indentation just over halfway up that A-pillar" and testified that this indentation was "consistent with the damage the pedestrian coming in contact with that vehicle would create." Based on his investigation, he concluded that the pedestrian's "head would be the most likely part of the body to cause that damage," and "[i]t would require a substantial amount of force" to cause that indentation.

With respect to the windshield, Lottman identified five individual impacts evidenced by fractures on the windshield. Concerning the windshield damage next to the A-pillar, Lottman testified that the pattern of "concentric rings around the point of impact" were indicative of a pedestrian's shoulder or "top of the thorax area" impacting the windshield. However, Lottman described that the four other impact marks towards the center of the windshield were "concentrated marks" created "after the concentric rings were created by the initial impact" near the A-pillar. His opinion that the four marks were created after the initial impact was premised on his observation that the fractures caused by those four impacts "stopped [at] the prior marks [caused by the initial impact,] which is how glass will break until it finds a place to release some energy." He stated that it would take "more energy [for the subsequent fractures] to cross that preexisting fracture." On cross-examination, Lottman affirmed that he could not identify the precise time period between the initial impact and the four additional impacts. He also believed that any contacts Moore's body may have had with the windshield after the initial impact would not have sufficient force to cause the four subsequent marks on the windshield. He explicitly stated that these four impacts "were not caused by a deer antler" because they "usually come [into the vehicle] and . . . deer don't have antlers in May."

- 4 -

Lottman also examined the scene of the accident on the bypass. He observed no evidence of "tire marks or skid marks" at the scene, and the "road surface was dry" without signs of previous precipitation. Lottman testified that the motor vehicle parts and other debris on and around the road "indicate[d] the area where [the] impact initially happened, over what kind of area evidence ended up, [and] what type of vehicle [that] may have been involved." He noted that the motor vehicle part farthest from where Moore was discovered was "just over 62 feet" east from her position. Lottman testified that this piece of debris indicated where Moore was first struck by a vehicle.

Based on the evidence at the scene of the accident and Moore's injuries, Lottman described this collision as a "roll-up or a wrap-up" collision. He testified that the vehicle would have first impacted Moore at the "leg [or] knee area" with its front bumper. This impact would then result in a "continuous motion from the bumper further up on to the . . . headlight area, the hood of the vehicle, and then, ultimately, into the windshield area of the vehicle." After that point, the vehicle "mov[ed] along with [Moore]" until she fell from the front of the vehicle to the ground, and the vehicle continued without stopping.

(c) Pierce

Pierce's testimony was generally consistent with his later statements given during the interview with law enforcement. He testified that he was driving on the bypass at approximately 8:48 p.m. on May 10, 2020, when he struck something. Just before the collision, Pierce was looking at his cell phone instead of the road. He did not stop after the collision because he did not know what he struck due his vision being obscured by an "orange glare across [his] windshield" caused by driving westbound at sunset. He stated that the "deer story" he gave to law enforcement during his interview and to his insurance company was a "lie" "made up out of fright."

According to Pierce, he told Megan at some point after the collision that he hit a deer and "not to worry about" the impact and damage to his vehicle. He also testified that Megan was the one who stated that the four marks in the middle of the windshield looked like deer antlers, but he told her that "those [marks] were not from deer antlers." He denied having caused the "damage to the windshield" of his vehicle.

With respect to the condition of his garage at the time law enforcement executed the search warrant, Pierce testified that he had not tried to conceal the damage to his vehicle. He described that the black garbage bags were put over the garage windows for "privacy" when Megan would smoke in the garage. He also stated that he boarded up the garage's back door because he would "catch [his] neighbor" in his garage, and the neighbor would claim that he was "looking for his dog or his cat."

(d) Melissa Culver

Melissa Culver (Melissa), Megan's twin sister, was called by the State to testify on rebuttal. She became acquainted with Pierce while he and Megan were dating and came to Pierce's residence on May 12, 2020. She testified that Pierce told her that he had hit a deer on May 10 and "showed [her] the car," "point[ing] out" that the four marks on the windshield were "from deer antlers." She subsequently spoke with Pierce and Megan, telling Pierce that "he should turn himself into law enforcement." She also described that she had been at the house approximately

one week before May 12; during that prior visit, the windows in Pierce's garage had not been covered, but the windows were covered when she visited Pierce's residence on May 12.

### 3. DISTRICT COURT JUDGMENT

Following closing arguments, the district court made specific findings from the bench. It noted its responsibility to determine the credibility of each witness and the weight to be given to a witness' testimony, "if any." The court specifically found that Pierce was not a credible witness, and that Megan and Melissa were credible. The court found Pierce guilty of leaving the scene of a personal injury accident and tampering with physical evidence. With respect to the accident, the court found beyond a reasonable doubt that: Pierce drove the vehicle that collided with Moore, this collision resulted in serious bodily injury to Moore, and Pierce failed to abide by the requirements imposed by § 60-697 on a driver involved in a motor vehicle accident causing personal injury. The court further determined that Pierce knew that he hit a person and caused injury "in multiple ways." The court first found that Pierce was "willfully blind to [the] . . . probable existence of the fact that [he] had struck a person and . . . took no actions to determine who or what [he] struck." Notwithstanding this "willful[] blind[ness]," the court also determined that Pierce had "actual knowledge" based on the evidence indicating that he had "change[d] the location of the accident in [his] story" about a claimed accident with a deer, and the court found that Pierce would have no reason to change the location of the accident "unless [he] knew that [he] had struck a person."

With respect to the charge of tampering with physical evidence, the district court found credible Lottman's testimony regarding the nature of the fractures in Pierce's windshield and noted the evidence indicated that Pierce told both Megan and Melissa that the four additional fractures were caused by "deer antlers." The court also found that the plastic bags placed by Pierce over the windows in his garage were intended "to conceal the 2011 Ford Fusion" from potential investigation, which he had known was underway through the phone call with his sister.

On July 28, 2021, the district court sentenced Pierce to 4 years' imprisonment and 2 years of post-release supervision for count I, leaving the scene of a personal injury accident. His driver's license was revoked for 15 years. Pierce was sentenced to 9 months' imprisonment for count II, tampering with physical evidence. The court ordered the sentences be served consecutively and granted 2 days' credit to Pierce's sentence on count I for time served.

Pierce appeals.

### III. ASSIGNMENTS OF ERROR

Pierce assigns, restated, that (1) the district court erred in admitting Lottman's expert testimony and in failing to adequately set forth its reasoning in overruling Pierce's objections to that testimony, and (2) the evidence was insufficient to support Pierce's convictions.

### IV. STANDARD OF REVIEW

An appellate court reviews the record de novo to determine whether a trial court has abdicated its gatekeeping function when admitting expert testimony. *State v. Casillas*, 279 Neb. 820, 782 N.W.2d 882 (2010).

There is no exact standard for fixing the qualifications of an expert witness, and a trial court is allowed discretion in determining whether a witness is qualified to testify as an expert. *Yagodinski v. Sutton*, 309 Neb. 179, 959 N.W.2d 541 (2021). Unless the court's finding is clearly erroneous, such a determination will not be disturbed on appeal. *Id.*

The standard for reviewing the admissibility of expert testimony is abuse of discretion. *Hemsley v. Langdon*, 299 Neb. 464, 909 N.W.2d 59 (2018). An abuse of discretion occurs when the trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: in reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Wheeler*, 308 Neb. 708, 956 N.W.2d 708 (2021).

## V. ANALYSIS

### 1. DISTRICT COURT'S *DAUBERT*/*SCHAFERSMAN* RULING

Pierce asserts on appeal that the district court erred in admitting Lottman's expert testimony and in failing to adequately set forth its reasoning in overruling Pierce's objections under the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001) (*Daubert*/*Schafersman*).

### (a) Background

The State endorsed Lottman as a witness on the information, but did not explicitly identify him as an expert witness. In a journal entry dated June 24, 2020, the district court ordered, in part:

> All pretrial motions, including a motion to exclude expert testimony regarding the validity of expert testimony (i.e. Schafersman issues) shall be filed prior to the pretrial conference hearing date [initially set for August 5, 2020]. Failure to do so constitutes a waiver of challenging the validity of expert testimony under Schafersman.

The pretrial conference hearing was continued until January 20, 2021. In a subsequent journal entry dated January 20, the court granted Pierce's "Motion to Take Depositions" of the "[e]mployees of the Nemaha County Sheriff's Office who are endorsed on the Information and who have knowledge of the case." Pierce later filed a waiver of his right to a jury trial on May 5. The record on appeal does not indicate that Pierce filed a pretrial motion objecting to Lottman's testimony.

During the course of his testimony, Lottman testified that his law enforcement training included specialization in "crash investigation, [accident reconstruction,] and impaired driving investigation." He affirmed that he has testified as an "accident reconstruction" expert in previous

trials. As Lottman described the damage to the A-pillar and windshield of Pierce's vehicle, Pierce's trial counsel objected, and the following colloquy occurred:

> [Pierce's trial counsel]: Your Honor, I object to this line of questioning as a *Daubert* issue. I don't believe they've established his expertise. I don't see any basis for this testimony besides pure speculation.
>
> THE COURT: Overruled. I think the witness is an expert in accident reconstruction and qualified to testify to this.

Pierce's counsel raised subsequent objections also alleging that Lottman was not qualified to give expert testimony regarding the damage to Pierce's vehicle and that his testimony amounted to speculation. The court overruled these objections as well. Lottman described on cross-examination that he has undertaken a "general accident reconstruction course of education" that covered various subjects concerning motor vehicle accidents.

(b) Legal Principles

A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. *Schafersman v. Agland Coop, supra*. Under the *Daubert/Schafersman* framework, a trial judge must determine at the outset whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. See *Schafersman v. Agland Coop, supra*. This entails a preliminary assessment to determine whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Fickle v. State*, 273 Neb. 990, 735 N.W.2d 754 (2007).

Further, in determining the admissibility of an expert's testimony, a trial judge may consider several more specific factors that *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra*, said might "bear on" a judge's gatekeeping determination. *Schafersman v. Agland Coop*, 262 Neb. at 233, 631 N.W.2d at 877. These factors include whether a theory or technique can be (and has been) tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community. *Schafersman v. Agland Coop, supra*. These factors are, however, neither exclusive nor binding; different factors may prove more significant in different cases, and additional factors may prove relevant under particular circumstances. *Id.*

(c) Sufficiency of Pierce's *Daubert/Schafersman* Objection

(i) Failure to File Pretrial Motion

As a preliminary matter, the State's brief on appeal raises the issue of whether Pierce's arguments concerning Lottman's expert testimony are properly before this court. The State claims that Pierce failed to properly object to Lottman's testimony in a pretrial motion, and cites to *Gonzales v. Nebraska Pediatric Practice*, 308 Neb. 571, 955 N.W.2d 696 (2021) (*Gonzales II*), for the proposition that "[a]ssuming that the opponent has been given timely notice of the proposed testimony, the opponent's challenge to the admissibility of evidence under *Daubert/Schafersman* must take the form of a concise pretrial motion." Brief for appellee at 12. The State further

identifies that Pierce failed to comply with the district court's order that "[a]ll pretrial motions . . . shall be filed prior to the pretrial conference hearing date." The State argues that because Pierce did not file a pretrial motion in this case, Pierce waived "any *Daubert*/*Schafersman* issues" and such issues "are therefore not properly before this court." Brief for appellee at 13.

We note that *Gonzales II* was an appeal to the Nebraska Supreme Court following further proceedings held at the trial court level after this court reversed and remanded the district court's grant of summary judgment in *Gonzales v. Nebraska Pediatric Practice*, 26 Neb. App. 764, 923 N.W.2d 445 (2019) (*Gonzales I*). Citing to *Gonzales I* and *State v. Simmer*, 304 Neb. 369, 935 N.W.2d 167 (2019), the Nebraska Supreme Court stated, "As the Court of Appeals noted elsewhere in [*Gonzales I*], a *Schafersman*[] objection must take the form of a concise pretrial motion." *Gonzales II*, 308 Neb. at 582, 955 N.W.2d at 705. The State argues that *Gonzales II* therefore mandates that a *Daubert*/*Schafersman* objection be made in a pretrial motion, and any objection under *Daubert*/*Schafersman* is waived if the party in question fails to file such pretrial motion.

We observe that in a bench trial, the gatekeeping duty of the trial court and the necessity for considering *Daubert*/*Schafersman* issues prior to or otherwise separate from trial are relaxed, as the court acts as the fact finder and is not responsible for "shielding the jury from unreliable evidence." See *State v. Braesch*, 292 Neb. 930, 948, 874 N.W.2d 874, 888 (2016). The trial court also maintains broad discretion over the conduct of trial and in the amendment or modification of its pretrial orders. See, *AVG Partners I v. Genesis Health Clubs*, 307 Neb. 47, 948 N.W.2d 212 (2020); *State v. Hinn*, 229 Neb. 556, 427 N.W.2d 791 (1988). But even as to specialized evidence, what specific duties *Daubert*/*Schafersman* impose depend on the circumstances. *State v. Casillas*, 279 Neb. 820, 782 N.W.2d 882 (2010).

Although the district court ordered the parties to file all pretrial motions, including *Daubert*/*Schafersman* objections, prior to the pretrial conference date, the court heard and overruled Pierce's *Daubert*/*Schafersman* objections at trial. In overruling Pierce's initial objections to Lottman's testimony, the court stated that it believed Lottman to be "an expert in accident reconstruction and qualified to testify to this." At the close of trial, the court additionally found that Lottman was "credible and . . . qualified to testify as to the glass" on Pierce's vehicle. It is apparent that the district court overruled Pierce's objections based on the merits rather than due to any failure by Pierce to make the objections in the form of a pretrial motion. We defer to the district court's discretion to consider Pierce's *Daubert*/*Schafersman* objections during the course of the bench trial, and we conclude that his failure to file a pretrial motion does not preclude our review of his allegations on appeal relating to Lottman's testimony.

*(ii) Specificity of Pierce's Objections*

The State also alleges, without elaboration, that Pierce's *Daubert*/*Schafersman* objections at trial were not "adequately specific." Brief for appellee at 13. Under Neb. Rev. Stat. § 27-702 (Reissue 2016) and *Daubert*/*Schafersman* jurisprudence, before admitting expert testimony, the trial court must (1) determine whether the expert's knowledge, skill, experience, training, and education qualify the witness as an expert; (2) if an expert's opinion involves scientific or specialized knowledge, determine whether the reasoning or methodology underlying the testimony is valid; (3) determine whether that reasoning or methodology can be properly applied to the facts

in issue; and (4) determine whether the expert evidence and the opinions related thereto are more probative than prejudicial. *Gonzales I, supra*. See, also, *State v. Braesch*, 292 Neb. 930, 874 N.W.2d 874 (2016). A *Daubert/Schafersman* objection should identify, in terms of those factors, what the opponent believes to be lacking in regard to the expert testimony. See, *State v. Casillas, supra*; *Gonzales I, supra*. It should be stated with enough specificity as to a particular factor that the court understands what is being challenged. See *Gonzales II, supra*. It is the objecting party's burden to raise an adequately specific objection to expert testimony. *Id.* A failure to make an adequately specific objection to expert testimony will result in a waiver of the right to challenge that factor. See *id.*

As noted previously, Pierce first objected to Lottman's testimony on the bases that the State failed to "establish [Lottman's] expertise" and that Lottman's testimony was premised on "pure speculation." As Lottman continued testifying concerning the damage to Pierce's vehicle, Pierce also objected to Lottman's qualifications to provide expert testimony regarding the glass fractures on Pierce's windshield. Upon Pierce's first objection, the district court overruled the objection and stated, "I think the witness is an expert in accident reconstruction and qualified to testify to this." It is evident the district court understood that Pierce had objected to Lottman's qualification as an expert, and it is likewise clear that Pierce was also objecting to the reliability of Lottman's methodology and opinion. Accordingly, our review of the record demonstrates that Pierce's *Daubert/Schafersman* objections were stated with sufficient specificity to inform the court. See *Gonzales II, supra*. Having determined that Pierce's allegations are properly before this court, we turn now to examine Pierce's claims regarding Lottman's testimony.

(d) District Court's Gatekeeping Duty

Pierce argues that the district court "did not adequately perform its gatekeeping function" when it "failed to explain the reasoning for overruling [Pierce's] objection to Lottman's testimony under *Daubert*" as required by *Zimmerman v. Powell*, 268 Neb. 422, 684 N.W.2d 1 (2004). Brief for appellant at 11-12.

The trial court has considerable discretion in deciding what procedures to use in determining if an expert's testimony satisfies the requirements of *Daubert/Schafersman*. See *Zimmerman v. Powell, supra*. However, this discretion does not allow the trial court to abdicate its duty as gatekeeper when faced with a *Daubert/Schafersman* objection. See *Zimmerman v. Powell, supra*. The record must include more than a recitation of the *Daubert/Schafersman* boilerplate and a conclusory statement that the challenged evidence is or is not admissible. *Zimmerman v. Powell, supra*. A trial court adequately demonstrates that it has performed its gatekeeping duty when the record shows (1) the court's conclusion whether the expert's opinion is admissible and (2) the reasoning the court used to reach that conclusion, specifically noting the factors bearing on reliability that the court relied on in reaching its determination. *Id.* The record must be such that the appellate court has an adequate basis to determine whether the trial court's actions were within the range of reasonable methods for distinguishing reliable expert testimony from false expertise. See *id.*

However, in a bench trial, these requirements are relaxed, and a trial court is afforded more flexibility in performing its gatekeeping function than in a jury trial. See *Fickle v. State*, 273 Neb. 990, 735 N.W.2d 754 (2007). This additional flexibility is due to the absence of a jury for which

the trial court would ordinarily need to shield from unreliable evidence. See *State v. Braesch, supra*. We presume that a trial court considers only competent and relevant evidence in rendering its decision. *Fickle v. State, supra*.

We observe two instances in the record where the district court addressed Pierce's *Daubert/Schafersman* objections with additional explanation. At his first objection, the court stated that it thought Lottman was "an expert in accident reconstruction and qualified to testify to this." In rendering its judgment on count II, the court found that Lottman was "credible and . . . qualified to testify as to the glass." While the court did not explicitly explain its reasoning, it is apparent from the record that the court found Lottman qualified as an expert based on his testimony concerning his previous experience and professional education in accident reconstruction. On our de novo review of the record, we find that the district court did not abdicate its gatekeeping function in this case. See *Fickle v. State, supra* (trial court afforded more flexibility in gatekeeping function in bench trial; appellate court presumes trial court considered only competent and relevant evidence in rendering its decision).

(e) Admissibility of Lottman's Testimony

Pierce claims that the district court erred in admitting Lottman's testimony without first establishing its reliability. He asserts that Lottman testified solely to his "conclusions" regarding the damage to Pierce's vehicle with "no explanation of how [each] conclusion was reached" or of his credentials. Brief for appellant at 10.

Before admitting expert opinion testimony under § 27-702, a trial court must determine whether the expert's knowledge, skill, experience, training, and education qualify the witness as an expert. *State v. Braesch*, 292 Neb. 930, 874 N.W.2d 874 (2016). The trial court's determination of whether a witness is qualified will not be disturbed on appeal unless the finding is clearly erroneous. See *State v. Daly*, 278 Neb. 903, 775 N.W.2d 47 (2009). There is no exact standard for fixing the qualifications of an expert witness, and a witness may qualify as an expert by virtue of his or her training or actual practical experience in the field. See *id.*

Upon determination that an expert is qualified, the district court must determine whether the testimony is admissible. See *State v. Braesch, supra*. To be admissible, an expert's opinion must be based on good grounds, not mere subjective belief or unsupported speculation. *Id.* However, in a bench trial, a trial court is not required to conclusively determine whether an expert's opinion is reliable before admitting the expert's testimony. *Id.* The trial court then retains discretion to decide after hearing further evidence whether the opinion meets reliability standards and should be credited in deciding disputed questions of fact. See *id.* We note that the Nebraska Supreme Court has held that a trial court in a bench trial neither abdicated its gatekeeping function nor abused its discretion in allowing an expert to testify subject to the opponent's opportunity to object to the testimony as necessary. See *Fickle v. State, supra*.

Having reviewed the record, the district court did not err in finding Lottman qualified to testify as an expert and admitting his testimony. Lottman testified that his law enforcement experience and professional education in accident reconstruction served as the backdrop for his expertise in this case. Given this testimony, we find no clear error in the district court's qualification of Lottman as an expert. Further, Pierce was afforded the opportunity to make *Daubert/Schafersman* objections to Lottman's testimony and subject Lottman's testimony to

thorough cross-examination. That the court did not make specific findings as to the testimony's reliability before its admission does not constitute error in this case. See *id.*

### (f) Reliability of Lottman's Testimony

Pierce also contests the reliability of Lottman's expert testimony. He argues that in Lottman's opinions concerning the damage to Pierce's vehicle, Lottman gave these opinions "without explanation of his technique[s] used, what data or training used to formulate his opinion, whether there is a rate of error in his technique, or a general acceptance of his views." Brief for appellant at 10-11.

As set forth previously, the reliability factors specifically described in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), are neither exclusive nor mandatory for the trial court to consider. Different factors may prove more significant in different cases, and additional factors may prove relevant under particular circumstances. See *Schafersman v. Agland Coop, supra*. Such factors may include the trial court's consideration of the expert witness' expertise and experience in his or her field. See *Fickle v. State, supra* (trial court did not abuse its discretion in finding traffic engineer's expert testimony reliable based on his expertise and experience in his field). The trial court's discretion further extends to deciding what factors are reasonable measures of reliability in each case. *Zimmerman v. Powell, supra*. Also, in a bench trial, a trial court is not required to conclusively determine whether an expert's opinion is reliable before admitting the expert's testimony; rather, the court can decide after hearing further evidence whether the opinion meets reliability standards and should be credited in deciding disputed questions of fact. See *State v. Braesch, supra*.

The trial court's determination of the reliability of Lottman's opinions relied primarily upon his qualification as an expert through his law enforcement experience and additional professional education. In light of our previous conclusion that the district court did not clearly err in finding Lottman to be qualified as an accident reconstruction expert and the presumption that the district court considered only competent and relevant evidence in rendering its decision, see *Fickle v. State, supra*, we find that the court did not err in relying upon Lottman's testimony and finding him credible.

### 2. SUFFICIENCY OF EVIDENCE

Pierce claims the evidence adduced at trial was insufficient to support his convictions. Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: in reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Wheeler*, 308 Neb. 708, 956 N.W.2d 708 (2021).

## (a) Leaving Scene of Personal Injury Accident

Pierce contends that the evidence adduced at trial was insufficient to prove beyond a reasonable doubt that he knew that he was "involved in an accident which resulted in an injury to a person." Brief for appellant at 12. He directs our attention to the evidence concerning the visibility conditions at the time of the accident, and particularly notes that he was "the only witness to testify to the actual weather conditions and sun location on [May 10, 2020,] at the time of the accident." *Id.* at 7. Pierce also argues that his actions taken after the impact did not "appear to be what someone would do when they knew they were involved in and fled the scene of an injury accident." *Id.*

Section 60-697(1) provides:

The driver of any vehicle involved in an accident upon either a public highway, private road, or private drive, resulting in injury or death to any person, shall (a) immediately stop such vehicle at the scene of such accident and ascertain the identity of all persons involved, (b) give his or her name and address and the license number of the vehicle and exhibit his or her operator's license to the person struck or the occupants of any vehicle collided with, and (c) render to any person injured in such accident reasonable assistance, including the carrying of such person to a physician or surgeon for medical or surgical treatment if it is apparent that such treatment is necessary or is requested by the injured person.

We note that Pierce does not contest the district court's finding concerning his involvement in the accident. Rather, the only dispute raised on appeal is whether Pierce had the requisite knowledge that the accident involved hitting another person. Knowledge that an accident has happened and that an injury has been inflicted is an essential element of the crime of leaving the scene of a personal injury accident. *State v. Snell*, 177 Neb. 396, 128 N.W.2d 823 (1964). "[L]ack of such knowledge constitutes a proper defense." *Id.* at 403, 128 N.W.2d at 828 (quoting *Behrens v. State*, 140 Neb. 671, 1 N.W.2d 289 (1941)). Knowledge that an accident occurred may be proved by circumstantial evidence, and the fact finder may consider all of the facts and circumstances which are indicative of knowledge. *State v. Zimmerman*, 19 Neb. App. 451, 810 N.W.2d 167 (2012) (applying framework for knowledge element of § 60-697 in context of leaving scene of property damage accident under Neb. Rev. Stat. § 60-696 (Reissue 2010)). See, also, *State v. Snell, supra.* Knowledge is a question of fact and not of law. *State v. Zimmerman, supra.*

Upon our review of the record, we find the evidence received at trial to be sufficient to sustain the district court's finding that Pierce had knowledge that he struck Moore on May 10, 2020. We note the testimony given at trial indicates that Pierce told Megan the night of the accident that he struck a deer. The next day, he told her that this accident occurred elsewhere on Highway 136 rather than on the bypass. He later acknowledged to law enforcement that this "deer story" was a "lie," and he instead actually hit something on the bypass. The district court noted that "[t]here would be no reason for [Pierce] to change the location of the accident in [his] story unless [he] knew that [he] had struck a person," and we cannot say that this inference is unreasonable given the record. In addition, as noted by the State, Lottman testified that his reconstruction indicated that Moore was likely "between the hood area and the windshield area" of Pierce's vehicle after the collision for approximately "62 feet" before she fell to the ground. All witnesses

- 13 -

testified that, despite being after sunset, visibility was still clear just after the time of the accident. Based on this evidence, a rational fact finder could conclude beyond a reasonable doubt that Pierce knew that he had struck Moore and failed to stop and render aid after the accident. To the extent that Pierce highlights his own testimony and apparent inconsistencies in the record in his argument, such issues go towards weight and credibility and are therefore not within the province of this court's review on appeal. See *State v. Wheeler, supra* (appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence). Accordingly, we find the evidence sufficient to sustain Pierce's conviction for leaving the scene of a personal injury accident.

## (b) Tampering With Physical Evidence

Pierce also argues that the evidence was insufficient to sustain his conviction for tampering with physical evidence. Section 28-922(1)(a) provides that a person tampers with physical evidence if that person, "believing that an official proceeding is pending or about to be instituted and acting without legal right or authority, . . . [d]estroys, mutilates, conceals, removes, or alters physical evidence with the intent to impair its verity or availability in the pending or prospective official proceeding." Physical evidence, as defined by § 28-922(2), means "any article, object, document, record, or other thing of physical substance."

Pierce's argument regarding this charge relies primarily on his assertion that the district court erred in admitting Lottman's testimony about the damage to Pierce's windshield. However, as set forth previously, we found no abuse of discretion in the district court's handling of Lottman's testimony. Accordingly, we consider the full scope of the evidence presented at trial in evaluating Pierce's claim.

We find the evidence in the record to be sufficient to sustain Pierce's conviction for tampering with physical evidence. Both Megan and Melissa testified that Pierce described the damage to his windshield as being caused by "deer antlers," and he made a point to draw their attention to these marks when he showed them his vehicle. Lottman also testified that the four additional fractures on Pierce's windshield occurred after the initial collision, and these fractures were unlikely to have been caused by the collision with Moore due to the lack of requisite force. Further, as found by the district court, "even without the windshield, we still have the garbage bags." Melissa's testimony indicated that Pierce placed garbage bags over the windows in his garage after he was informed of law enforcement's investigation into the accident. It was entirely within the fact finder's province to conclude the "garbage bags were put on the windows of the garage to conceal the Ford Fusion and not because someone was smoking in the garage." Based on the evidence, we conclude that a rational fact finder could find beyond a reasonable doubt that Pierce tampered with physical evidence while believing that an official proceeding was pending or about to be instituted with the intent to impair the vehicle's discovery and availability.

## VI. CONCLUSION

For the reasons set forth above, we affirm Pierce's convictions and sentences.

AFFIRMED.